

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-23-2005

# St George Warehouse v. NLRB

Precedential or Non-Precedential: Precedential

Docket No. 04-2893

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"St George Warehouse v. NLRB" (2005). *2005 Decisions.* Paper 593.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/593

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT

Nos. 04-2893 and 04-3363

ST. GEORGE WAREHOUSE, INC.,
Petitioner in No. 04-2893
v.

NATIONAL LABOR RELATIONS BOARD,
Petitioner in No. 04-3363

On Application for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board Entered May 12, 2004, in Case 22-CA-24902

Argued May 9, 2005

Before: SLOVITER and FISHER, Circuit Judges,
and POLLAK,[*] District Judge.

*Honorable Louis H. Pollak, Senior District Judge for the
United States District Court for the Eastern District of
Pennsylvania, sitting by designation.

(Filed August 23, 2005)

JOHN A. CRANER, Esq. (argued)
Craner, Satkin & Scheer, P.A.
320 Park Avenue
P.O. Box 367
Scotch Plains, NJ 07076
     *Attorney for St. George Warehouse, Inc.*


DANIEL A. BLITZ, Esq. (argued)
MEREDITH L. JASON, Esq.
ARTHUR F. ROSENFELD, Esq.
JOHN E. HIGGINS, JR., Esq.
JOHN H. FERGUSON, Esq.
AILEEN A. ARMSTRONG, Esq.
National Labor Relations Board
1099 14th Street, NW
Suite 8101
Washington, DC 20570
     *Attorneys for National Labor Relations Board*

---

OPINION OF THE COURT

---

POLLAK, District Judge:

St. George Warehouse, Inc. ("St. George"), a company that warehouses shipping containers, petitions for review of an order of the National Labor Relations Board ("NLRB" and "Board") finding that it violated section 8(a)(5) and 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1) and (5),[1] by unilaterally transferring unit work to temporary agency employees, who are not union members. To remedy these violations, the Board ordered St. George to restore the ratio of direct hires to temporary agency employees to the status quo that existed just prior to the union election. St. George contests the Board's order, arguing that the union's complaint was time-barred, that the hiring practices complained of were consistent with the NLRA, and that the restoration remedy is "repugnant" to the purposes and policies undergirding the NLRA. The Board has cross-petitioned, seeking enforcement of its order. For the reasons which follow, we will deny the petition for review and enforce the order of the Board.

I.

---

[1]"Unfair labor practices by employer. It shall be an unfair labor practice for an employer--
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157]; ... (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [29 USCS § 159(a)]." 29 USCS § 158(a).

St. George is a corporation with an office and place of business in South Kearny, New Jersey, that warehouses containers from ships. On March 8, 1999, Local 641 of the International Brotherhood of Teamsters ("IBT") petitioned the NLRB for a representation election of St. George's warehouse employees. According to Local 641, the unit was to include "[a]ll full-time and regular part-time warehouse employees employed by [St. George] at its South Kearny, New Jersey facility, *but excluding all temporary agency employees*, office clerical employees, professional employees, guards and supervisors as defined in the Act." J.A. at 11 (emphasis added).[2]

On April 14, 1999, a secret ballot election was held at St. George. The union won the election and, on October 27, 2000, the union was certified. On December 19, 2000, the union requested that St. George meet with it to begin the collective bargaining process. St. George refused, and Local 641 filed an unfair labor practice charge. On April 10, 2001, the Board ruled in favor of the union on summary judgment

---

[2]St. George represents, and the Board does not dispute, that what distinguishes the "temporary agency employee" from the employee eligible for inclusion in the unit is not the amount of time for which each works for St. George but the employer of each. In particular, the agency employee is jointly employed by the agency and St. George, while the unit employee is employed directly and exclusively by St. George.

4

and, on August 7, 2001, the Third Circuit enforced the Board's order directing St. George to bargain collectively with the union. *St. George Warehouse, Inc. v. NLRB*, 261 F.3d 493 (3d Cir. 2001).

In 2002, the union filed a second unfair practice charge with the NLRB. That charge alleged that St. George had decided, some time after the union election, to stop making direct hires, and to replace terminated or departed workers exclusively with agency (i.e., non-unit) employees. As a result of this practice, the unit decreased from 42 employees at the time of the election to 8 employees by July 2002, when the union and St. George appeared before an ALJ for a hearing inquiring into St. George's hiring practices. It is undisputed that the decision to replace departing direct hires with temporary agency workers was made unilaterally, without notice to the union or an opportunity for it to bargain.

The ALJ found that St. George had altered the status quo that existed before the union election. More specifically, the ALJ determined that prior to the union's election, which was held in April 1999, St. George did not have a policy or practice of hiring agency warehousemen to replace direct hires who left St. George's employ. The ALJ concluded that St. George's unilateral transfer of unit work to temporary agency employees without giving the union notice and the opportunity to bargain violated section 8(a)(5) and (1) of the

NLRA, 29 U.S.C. §158(a)(5) and (1).[3]

In reviewing the ALJ's decision, the Board agreed with the ALJ's finding that St. George had violated section 8(a)(5) and (1) by unilaterally transferring work to agency employees. The Board disagreed with the ALJ's proposed remedy for the section 8(a)(5) and (1) violations, however. The ALJ had recommended that St. George immediately restore and maintain the ratio of direct hires to agency employees that existed at the time of the union election, which the ALJ found to be 7:1. The Board determined that the 7:1 ratio was not entirely appropriate because, prior to the union election, the total number of agency employees used by St. George fluctuated from week to week, as did the total number of direct hires. The ALJ's 7:1 ratio did not account for this fluctuation. Thus, the Board decided to leave to the compliance stage the determination of the proportion of direct hires and agency employees that St. George must maintain in

---

[3]The ALJ found further that St. George violated these same provisions by (a) failing to furnish the union with the names and addresses of the temporary agencies supplying workers to St. George, as well as the contracts governing the terms of employment of the temporary agency workers; and (b) engaging in surface bargaining (i.e., by failing to engage in good faith bargaining). The Board affirmed the ALJ with respect to St. George's failure to supply the information that the union requested, but rejected the ALJ's finding with respect to surface bargaining. Neither of these issues is before this court.

order for the unit to be properly restored.[4]

St. George has petitioned for review, and the Board has cross-petitioned for enforcement of its order.

## II.

Section 10(b) of the NLRA, 29 U.S.C. § 160(b), provides in relevant part that "no complaint shall issue based on any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made." St. George argues that the union was aware of the labor practice of which it complains more than six months before November 26, 2001, when the union filed its charge. In particular, St. George maintains that, as of December 2000, Jan Katz, who was made the union's business agent in April

---

[4]The Board's order also required St. George to notify, and on request bargain collectively with, the union before implementing any changes in the terms of the unit members' employment; provide the union with the information it requested regarding the agencies and the agency workers' employment terms; post copies of the Board's decision at the warehouse; and notify the Board by sworn affidavit sent within 21 days of the date of the Board's decision that St. George was in compliance.

Because the Board found that St. George had not engaged in surface bargaining, it rejected the remedy that the ALJ had proposed to address this alleged violation.

2001, knew or should have known about St. George's transfer of unit positions to temporary agency employees. St. George thus contends that the union's complaint is time-barred.

St. George presented this argument to both the ALJ and the Board. The ALJ found that Katz, who testified that it was August 2001 when he first learned of the shift in employee composition, was credible. The Board agreed that St. George had not met its burden of establishing that the union had actual or constructive notice of St. George's hiring practices prior to August 2001. St. George nonetheless asks the court to reject Katz's testimony and credit instead the testimony of Tony Daniels, from whose statements St. George infers that Katz would have learned of the unilateral transfers in April 2001.

"The final determination of credibility rests with the Administrative Law Judge as long as he considers all relevant factors and sufficiently explains his resolutions." *NLRB v. W. C. McQuaide, Inc.*, 552 F.2d 519, 526 n.14 (3d Cir. 1977). Further, "[t]he ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable." *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718-19 (3d Cir. 2001) (quoting *NLRB v. Lee Hotel Corp.*, 13 F.3d 1347 (9th Cir. 1994)). We will not substitute our own credibility finding for the ALJ's, especially where, as the ALJ noted was the case here, a witness's testimony is corroborated by documentary evidence and the testimony of other witnesses. Accordingly, we find no error in the Board's determination that the charge was not time-barred.

III.

Because St. George's practice of supplementing direct hires with temporary agency employees pre-dated the union election, and because the union certification specifically excluded, *inter alia*, "temporary agency employees," St. George argues that it was free to hire temporary agency employees in whatever numbers it chose without first seeking union approval.

The ALJ found that the decision to replace direct hires with temporary agency employees occurred some time after the union election, but before certification, and that this decision marked a significant change from St. George's pre-election hiring practices, according to which it used agency employees only to supplement and augment the workforce consisting of direct hires, and not to replace the direct hires.

"[A]n employer that chooses unilaterally to change its employees' terms and conditions of employment between the time of an election and the time of certification does so at its own peril, if the union is ultimately certified." *Overnite Transportation Co.*, 335 N.L.R.B. 372, 372-373 (2001). The record amply supports the ALJ's findings regarding the timing and significance of St. George's decision to replace direct hires with temporary agency workers. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Accordingly, we find no reason to disturb the ALJ's conclusion, which the Board adopted, that St. George was required to bargain with the

9

union over the issue of replacing departing or terminated direct hires with agency employees, and that St. George's failure to do so constituted a violation of section 8(a)(5) and (1) of the NLRA.

IV.

St. George contests, on a number of grounds, the portion of the Board's remedy requiring St. George to restore the employee composition existing prior to the union election.[5]

---

[5]Citing 29 U.S.C. § 160(e) and 29 C.F.R. § 102.48(d), the Board argues that, because St. George did not move for reconsideration of the Board's restoration remedy, St. George's objections to that remedy are not properly before this court. Section 160(e) provides, in pertinent part, that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." St. George did contest the restoration remedy before the Board, however, and so § 160(e) does not bar the issue before the court. While 29 C.F.R. § 102.48(d)(1) states, in pertinent part, that a party "may, because of extraordinary circumstances, move for reconsideration, rehearing, or reopening of the record after the Board decision or order," it does not make reconsideration a prerequisite to presenting a claim in court. Thus, we find no bar to St. George's objections to the restoration remedy.

In general, the Board's power to fashion remedies for unfair labor practices is a "broad and discretionary one, subject to limited review." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216 (1964). Further, the NLRB frequently orders restoration to the status quo ante in cases, like the instant one, where the employer unilaterally alters the conditions of employment. *See, e.g.*, *id.* at 215; *NLRB v. Cauthorne*, 691 F.2d 1023, 1025 (D.C. Cir. 1982); *Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892 (6th Cir. 1996); *Southwest Forest Indus. v. NLRB*, 841 F.2d 270, 274 (9th Cir. 1988); *Duke University and Amalgamated Transit Union, Local 1328*, 315 N.L.R.B. 1291 (1995); *Land O'Lakes*, 299 N.L.R.B. 982 (2000).

St. George nonetheless opposes the restoration remedy. It argues that the Board's remedy would be appropriate only if St. George had terminated some of the direct hires *because* of their involvement with the union, which would constitute a violation of section 8(a)(3) of the NLRA,[6] and that neither the ALJ nor the Board found that St. George had committed such a violation. The argument is wide of the mark. The restoration remedy need not be limited to section 8(a)(3) violations in order for it to "be adapted to the situation which calls for redress." *N.L.R.B.* v. *Mackay Radio & Telegraph Co.*, 304

---

[6] Section 8(a)(3), 29 U.S.C. § 158(a)(3), defines an unfair labor practice as "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

11

U.S. 333, 348 (1938). The NLRB has in the past ordered similar restoration remedies where no section 8(a)(3) violation was found. *See, e.g.*, *Duke University*, *supra* (requiring that employer who was found to have violated section 8(a)(5) and (1), by ceasing to hire full-time drivers who would be union members and instead hiring non-union part-time drivers, restore the unit to what it would have been without the unlawful changes).

St. George next argues that the Board's remedy is improper because it guarantees to the union a specific number of constituents despite the fact that some of the former unit workers departed voluntarily. The argument misconstrues the remedy, however, for the Board's order defers to the compliance stage a determination of the proportion of union to agency employees to be restored. Thus, at the compliance stage, the Board could take ordinary attrition rates into account in setting the target ratio.

St. George argues further that the remedy gives the union control over the agency hires without the benefit of an election. The argument presumes that, to effectuate the Board's remedy, St. George would have to confer direct hire status upon the temporary agency employees currently on its workforce. Yet, while the ALJ suggested this option as *one* way in which St. George could restore the status quo, neither the ALJ nor the Board mandated this route. Moreover, even if St. George did elect this route, "[t]here is ... nothing permanent in a bargaining order, and if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a representation

12

petition." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613 (1969).

In its reply brief, St. George alleges that only a minority of the currently employed direct hires continue to support the union. Yet the record before us neither supports nor controverts this contention, and so we intimate no view on the question of whether changed circumstances have undermined the propriety of the Board's restoration remedy.[7]

Finally, St. George argues that the relevant date for purposes of ascertaining the status quo ante should not be April 1999 because, according to St. George, "the Board cannot go back more than six months from the date of filing the charge." St. George appears to glean this supposed limitation from its readings of 29 U.S.C. § 160(b), and *NLRB v. Katz*, 369 U.S. 736, 746 n.13 (1962). In fact, § 160(b) states that "no *complaint* shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made...."

---

[7]It is possible that St. George will have an opportunity, at the compliance stage, to present evidence regarding the current state of union support. *See, e.g.*, *Duke University*, 315 N.L.R.B. at 1291 (permitting employer to introduce evidence at the compliance stage regarding appropriateness of restoration remedy in light of post-trial events); *We Can, Inc.*, 315 N.L.R.B. 170 (1994) (same). *But compare Lear Siegler, Inc.*, 295 N.L.R.B. 857, 861 (1989).

13

(emphasis added). Similarly, the time bar at issue in *Katz* pertained to the date of the filing of the charge relative to the date of the allegedly unlawful conduct; *Katz* did not deal with the issue of how far back the Board may look in fixing the status quo ante. In short, neither *Katz* nor § 160(b) precludes remedies that seek to address or restore conditions that existed more than six months prior to the filing of an NLRB complaint, and no such restriction exists elsewhere, *see, e.g.*, *Duke University*, 315 N.L.R.B. at 1291-92 (ordering a restoration to the status quo existing prior to the August 1991 union election in a case for which the charge was filed on August 10, 1993, and amended on September 23, 1993).

In short, St. George's objections to the status quo remedy are unpersuasive. That remedy addresses the violations St. George committed, and is appropriately tailored to redress the resultant harms. Accordingly, we will not disturb the Board's remedial order.[8]

---

[8]While the Board eschewed imposition of the ALJ's recommended restoration to a 7:1 ratio between unit and temporary agency employees, we nonetheless presume that the ALJ's findings regarding the division of labor between the two sets of employees will provide some guidance to the Board at the compliance stage. We thus note that the 7:1 ratio at which the ALJ arrived does not comport with his findings of fact: The ALJ found that, at the time of the election, St. George employed 7 agency employees and 42 direct hires, for a total of 49 employees. The correct ratio between direct hires and agency employees at the time of the election is thus 6:1,

V.

For the foregoing reasons we will deny the Petition for Review of the Order of the National Labor Relations Board and grant the Cross-Application for Enforcement of the Order of the National Labor Relations Board.

---

not 7:1.