PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

Nos. 11-4345 & 11-4537

—————————

GRANE HEALTH CARE;
EBENSBURG CARE CENTER LLC, d/b/a
CAMBRIA CARE CENTER,

Petitioners (No. 11-4345)
Cross-Respondents

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent
Cross-Petitioner (No. 11-4537)

—————————

Petition for Review and Cross-Application
For Enforcement of an Order of
The National Labor Relations Board
(Nos. 6-CA-36791/36803/36915)

—————————

Argued September 18, 2012

Before: AMBRO, GREENAWAY, JR.,
and TASHIMA,[*] Circuit Judges

(Opinion filed: April 5, 2013)

Richard J. Antonelli, Esquire (**Argued**)
John A. McCreary, Jr., Esquire
Rebecca J. Dick-Hurwitz, Esquire
Babst, Calland, Clements & Zomnir
Two Gateway Center, 6th Floor
Pittsburgh, PA   15222

      Counsel for Petitioners/Cross-Respondents
      Grane Health Care, Ebensburg Care Center LLC

Lafe E. Solomon
   Acting General Counsel
Celeste J. Mattina
   Deputy General Counsel
John H. Ferguson
   Associate General Counsel
Linda Dreeben
   Deputy Associate General Counsel
Jill A. Griffin, Esquire
Gregory P. Lauro, Esquire (**Argued**)
National Labor Relations Board
Appellate and Supreme Court
   Litigation Branch, Division of Enforcement
1099 14th Street, N.W.

---

[*] Honorable A. Wallace Tashima, Senior Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

Washington, DC   20570

Counsel for Respondent/Cross-Petitioner
National Labor Relations Board

—————————

OPINION OF THE COURT

—————————

AMBRO, Circuit Judge

For many years Cambria County, a political subdivision of Pennsylvania, owned and operated Laurel Crest Nursing and Rehabilitation Center ("Laurel Crest"). As a state-owned facility, labor relations at Laurel Crest were subject to Pennsylvania labor law. In January 2010, however, Grane Healthcare Co. ("Grane") bought Laurel Crest, and established a new entity, Cambria Care Center ("Cambria Care"), to serve as its operator.[1] Because Grane and Cambria Care (collectively, the "Company") are private employers, labor relations at the facility became subject to the National Labor Relations Act (the "NLRA" or "Act"), 29 U.S.C. § 151 *et seq.*

The Act's preamble expressly states Congress's purpose in enacting a federal labor law.

> It is hereby declared to be the policy of the United States to eliminate the causes of certain

---

[1] Cambria Care is the fictitious business name of Ebensburg Care Center LLC.

> substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

*Id.* § 151. In service of these objectives, Congress included in the NLRA a number of substantive provisions prohibiting certain labor and management practices. Among other things, the Act prohibits employers from refusing to bargain collectively with their employees' representatives, *id.* § 158(a)(3), and from not hiring applicants based on their union membership or activity, *id.* § 158(a)(5).

This case arises from a decision and order of the National Labor Relations Board (the "Board") concluding that the Company, in connection with its takeover of Laurel Crest, violated these provisions. The Company has petitioned us for review, and the Board has cross-petitioned us for enforcement, of this decision and order. For reasons to be discussed, we deny the Company's petition for review and grant the Board's cross-petition for enforcement.[2]

_____

[2] The Board had jurisdiction to hear this matter pursuant to 29 U.S.C. § 160(a). We have jurisdiction under 29 U.S.C.

## I. Background

As noted, Laurel Crest's workforce was employed by Cambria County, a public employer subject to Pennsylvania's Public Employee Relations Act (the "PERA"), 43 Pa. Cons. Stat. § 1101 *et seq*. Laurel Crest had two unions—one for nonprofessional employees and one for nurses—certified under the PERA. In 1971, the Pennsylvania Labor Relations Board (the "PLRB") certified Local Union No. 1305 ("Local 1305") as the exclusive union representative of nursing aides, housekeepers, and other nonprofessional employees at Laurel Crest after that unit of employees elected Local 1305 to represent it. Fifteen years later, in 1986, the PLRB certified the predecessor to the Service Employees International Union (for convenience, the current union and its predecessor are referred to as the "SEIU") as the exclusive union representative of nursing employees at Laurel Crest after that unit of employees elected representation by the SEIU. Following certification, Cambria County recognized each union as the representative of its respective employee unit, and continued to do so throughout its ownership of the facility.

When Grane, which owns multiple nursing facilities across Pennsylvania, attempted to purchase Laurel Crest on two separate occasions—unsuccessfully in 2003 and then successfully in 2009—the unions were by and large against Grane taking over. In 2003, both unions publicly opposed the sale and filed legal action intended to stop it. In 2009, Local 1305 again opposed the sale outright, and publicly took that position, while the SEIU, though less absolute, engaged in a

§§ 160(e) and (f) to hear both the Company's petition for review and the Board's cross-petition for enforcement.

5

series of rallies to raise awareness about concerns it had with the sale.

Despite the opposition and expressions of concern, in September 2009 Cambria County entered into an asset purchase agreement with Grane. Following its execution, Grane implemented transfer of the facility to Cambria Care. That transfer was officially completed on January 1, 2010, and the facility became known as Cambria Care. During that acquisition period, from September 2009 through December 2009, Grane was responsible for all decisions relating to the facility's operations, including its initial staffing. Leonard Oddo, a Grane Vice President, interviewed and hired the top administrator at Cambria Care, Owen Larkin. And, even after hiring Larkin, Oddo and other Grane representatives remained in charge of hiring Cambria Care's workforce.

A variety of labor-related decisions relevant to this petition were made around this time. Prior to the consummation of the transfer, most Laurel Crest employees applied to work at Cambria Care, and the vast majority of those applicants were hired. Grane, however, did not hire four of the five Local 1305 officers who applied for positions. It also refused to hire an SEIU-represented employee who had participated in SEIU's public activities relating to the sale. In addition, Local 1305 and the SEIU each requested that Grane and Cambria Care recognize it as the exclusive bargaining representative of its unit of employees. Both Grane and Cambria Care refused to recognize or bargain with the unions, and continued to do so until the time the Board issued its decision and order.

Though Cambria Care became the facility's operator in January 2010, Grane retained control over aspects of its operations. Importantly, during the acquisition period Grane and Cambria Care entered into a management agreement

6

designating Grane as the manager of the facility and Cambria Care as its operator. The agreement—which was executed by two individuals who were simultaneously officers for both Grane and Cambria Care—was adopted without negotiation and has not since been altered. Per that agreement, Grane's employees maintained a significant, ongoing presence at the facility, and continued to manage significant facets of the facility's operations.

This close relationship between the companies was also preserved by their ownership structure. Grane owns a controlling stake, 99.5%, of Cambria Care, and the overlap of the companies' officers is near complete. In addition, while Larkin is nominally in charge of Cambria Care, he continues to report to and can be terminated by Oddo. Indeed, a healthcare license application filed with Pennsylvania on Cambria Care's behalf attests that all of the nursing facilities owned by Grane in Pennsylvania are under "common management, ownership, and/or control."

Shortly after Grane and Cambria Care took over of the facility, Local 1305 and the SEIU filed unfair labor practice charges against Grane and Cambria Care. Following its investigation, the Board's General Counsel issued a complaint alleging that Grane and Cambria Care were jointly and severally liable for failing to recognize and bargain with the unions in violation of NLRA § 8(a)(5) and refusing to hire the four Local 1305 officers and one SEIU-represented employee on the basis of their union membership or activities in violation of NLRA § 8(a)(3).

After a six-day hearing, an administrative law judge ("ALJ") issued a decision in this matter making the following findings: (1) Grane and Cambria Care were a single employer subject to the Act, and thus jointly and severally liable for remedying unfair labor practices committed by either of

7

them; (2) the Company, as a single employer, violated the Act by failing to recognize and bargain with Local 1305, though not by refusing to recognize and bargain with the SEIU;[3] and (3) the Company, as a single employer, violated the Act by not hiring the five employees due to antiunion animus. The Board affirmed the ALJ's findings, adopted its decision, and issued an order requiring the Company, among other things, to recognize and bargain with Local 1305 and hire the five employees to the positions for which they had applied.

## II. Standard of Review

We afford considerable deference to the Board. The Supreme Court has "emphasized often that the [Board] has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990). "We will [therefore] uphold a Board rule as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board." *Id.* at 787 (citations omitted). "Moreover, if the Board's application of such a rational rule is supported by substantial evidence on the record," we will "enforce the Board's order." *Fall River Dyeing & Finishing Corp. v.*

---

[3] The ALJ determined that the Company did not violate the Act by failing to recognize and bargain with the SEIU because that union only was elected to meet with management to discuss employment issues on behalf of Laurel Crest nursing employees and not to bargain collectively on their behalf. *See* 29 U.S.C. § 159(a) (defining employee representatives as those selected by a majority of employees "for the purposes of collective bargaining"). This aspect of the ALJ's Board-adopted decision is not challenged here.

*NLRB*, 482 U.S. 27, 42 (1987); *see also NLRB v. Scott Printing Corp.*, 612 F.2d 783, 787 (3d Cir. 1979); 29 U.S.C. § 160(e). In particular, we defer to the Board's credibility determinations, and will reverse them only if they are "'inherently incredible or patently unreasonable.'" *St. George Warehouse, Inc. v. NLRB*, 420 F.3d 294, 298 (3d Cir. 2005) (quoting *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718–19 (3d Cir. 2001)).

## III. Discussion

The Company raises three challenges to the Board's decision and order in its petition.

(1) Substantial evidence does not support that Grane and Cambria Care are a single employer.

(2) Use of the successorship doctrine to find that the Company had a duty to bargain with Local 1305 is contrary to the terms of the Act.

(3) Substantial evidence does not support that the Company violated the Act by not hiring the five Laurel Crest employees.

### A. Single Employer Status

The Act prohibits covered employers, as that term is defined by the NLRA, from committing unfair labor practices such as refusing to bargain with their employees' representatives or not hiring an applicant based on his union membership or activities. 29 U.S.C. §§ 152(2), 158(a). "The single employer doctrine is a creation of the Board which allows it to treat two or more related enterprises as one employer within the meaning of the [Act]." *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 504

9

(5th Cir. 1982). When the Board finds that two nominally separate entities are a single employer, they are jointly and severally liable for remedying unfair labor practices committed by either of them. *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982); *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1283 (7th Cir. 1989).

"Single employer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arm's length relationship found among unintegrated companies." *Browning-Ferris*, 691 F.2d at 1122 (quotation marks and citations omitted). The Board considers four factors in determining whether separate entities are a single employer: "(1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership." *Id.* No one factor is controlling, although the first three factors, particularly centralized control over labor relations, are generally considered more compelling that the fourth. *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir. 1983).

The Company asks that we reverse the Board's determination that Grane and Cambria Care are a single employer. It does not challenge the Board's finding that Grane controlled operations at the facility during the acquisition period from September 2009 until December 2009, or that Grane and Cambria Care continued to have common ownership, common management, and interrelated operations following transfer of the facility into Cambria Care's hands in January 2010. Nonetheless, it argues that we must reverse the Board's ruling because the evidence in the record demonstrates that Grane did not control labor relations at the facility—arguably the most critical factor, *Mercy Hosp. of Buffalo*, 336 N.L.R.B. 1282, 1284 (2001)—from the day that the transfer occurred. We disagree.

10

Our biggest concern with the Company's argument is that it is based on discredited testimony. Owen Larkin—who, as noted, was Cambria Care's top administrator—testified that he, and not Grane, controlled day-to-day operations at the facility after the transfer. The Board found this testimony self-serving and overwhelmed by other evidence in the record. In particular, it found that Larkin's lack of knowledge about much of the facility's operations—including important aspects of the facility's financial dealings—undermined his claim that he was in charge. The Board found it more likely that Oddo, the Grane Vice President to whom Larkin reported, actually made many, if not most, of the important decisions at the facility.

We also do not deem as irrelevant evidence of Grane's control during the acquisition period. Prior to the transfer date, Grane made every important decision relating to establishing operations at the facility. This included hiring Cambria Care's workforce, determining initial salaries and benefits, and putting in place a variety of other employment-related policies, all of which continue to affect employees at the facility. In fact, the no-hire decisions that are at issue in this appeal were made by Grane representatives supervised by Oddo during the period of acquisition.

There is, moreover, substantial evidence in the record that Grane continued to control operations at Cambria Care after the transfer date. As the ALJ explained,

> Grane did not get Cambria Care up and running and then walk away, leaving Cambria Care as an independently functioning operation that would succeed or fail on its own. To the contrary, to begin with, Grane and Cambria

11

Care continue to have, as [the Company] concedes[,] common ownership and common management at the executive level, two factors the Board looks to in determining single employer analysis. But more than that, the potential control of Cambria Care that is a function of Grane's common ownership and common upper management with Cambria Care is actualized every day by the ubiquitous presence of Grane personnel in the affairs of Cambria Care—a state of affairs deliberately established by Grane when it set up Cambria Care's operations in the fall and winter of 2009.

*Grane Healthcare Co.*, 357 NLRB No. 123, 2011 WL 6002197, at *52 (Nov. 30, 2011) (citation omitted). During the acquisition period, when Grane's control was complete, it took specific actions—including, as noted, putting in place the management agreement between Grane and Cambria Care—to ensure its influence would continue after the transfer date.

The Board's determination that Grane and Cambria Care are a single employer was based on detailed factual findings relating to each of the four factors normally considered to determine that status. Though we do not exhaustively recite those findings here, they describe two deeply integrated companies with centralized control emanating from Grane. We are not persuaded by the

12

Company's contention that the Board's single-employer decision fails the substantial evidence test.

B. Duty to Bargain

The Board concluded that the Company, as a single employer, violated § 8(a)(5) of the Act by failing to recognize and bargain with Local 1305. That section makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). In order to be an employee representative entitled to bargain with an employer, a union or other entity must have the support of a majority of a properly defined unit of employees.[4] *Id.* § 159(a). To promote stability, the Board has created a number of doctrines whereby majority support is presumed to exist.[5]

The Company challenges the Board's use of one of these doctrines, successorship, to find that it had a duty to

---

[4] Majority support is generally established "by one of two methods: [1] [Board] certification pursuant to an election or [2] voluntary recognition of the union by the employer." *Lincoln Park Zoological Soc'y v. NLRB*, 116 F.3d 216, 219 (7th Cir. 1997) (citing *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1246 (D.C. Cir. 1994); *NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 750 (7th Cir. 1981)).

[5] For example, there is an irrebuttable presumption of majority support during both the first year after certification and the first three years of a collective-bargaining agreement. *Levitz Furniture Co.*, 333 N.L.R.B. 717, 720 n.17 (2001). At other times, that presumption is rebuttable by proof of loss of majority support. *Id.* at 720.

13

bargain with Local 1305. Broadly speaking, under this doctrine "[a] new employer has a duty . . . to bargain with the incumbent union that represented the predecessor's employees when there is a 'substantial continuity' between the predecessor and successor enterprises." *Chester ex rel. NLRB v. Grane Healthcare Co.*, 666 F.3d 87, 100 (3d Cir. 2011) (quoting *Fall River*, 482 U.S. at 43). The Company does not contest the presence of the requisite substantial continuity, which is a fact-intensive inquiry. Instead, it argues that, as a matter of law, the successorship doctrine cannot be applied where the predecessor employer is a state (or political subdivision thereof) not subject to the Act. According to the Company, because Cambria County did not have a legal obligation under the NLRA to bargain with Local 1305 when it controlled the facility, the Company could not inherit that obligation when it took control of the facility.

The Company misapprehends the issue. It is indisputable that Cambria County, as a political subdivision of Pennsylvania, was not covered by the NLRA. 29 U.S.C. § 152(2). Whether it was subject to the Act when it operated the facility, however, is not determinative. The Company is not being held liable for violations of the Act committed by Cambria County. It is being held liable for its refusal to recognize and bargain with Local 1305.

The imposition of this latter liability is permissible provided the majority support Local 1305 established under Pennsylvania law could, consistent with the NLRA, establish a presumption of majority support under federal law. In that respect, there is nothing in the Act precluding the Board from finding—as it did—that certification under Pennsylvania law is sufficient. The Act provides that an employer must bargain with a representative selected by a majority of employees to do so on their behalf. *See* 29 U.S.C. §§ 158(a), 159(a). It is

14

silent, however, on the ways in which that majority support can be established.

While there may be instances where the process of establishing majority support under state law is so unreliable that the Board's application of the successorship doctrine would be irrational, this is not so here.[6] To the contrary, there is significant support for the Board's determination that certification under the PERA provides substantially similar protections for employers and employees as Board certification under federal law. Both federal and Pennsylvania law, for example, allow majority support to be

---

[6] The Company also argues that application of the successorship doctrine is inconsistent with the Supreme Court's decision in *Linden Lumber Div, Summer & Co. v. NLRB*, 419 U.S. 301 (1974). In that case, the Court upheld the Board's determination that an employer is not legally bound to recognize a union seeking initial representation on the basis of authorization cards purporting to show majority support. *Id.* at 309–10. According to the Company, *Linden* stands for the proposition that when "an employer is presented with an initial demand for recognition by a labor organization, it has a right to have the issue determined in a Board election." Appellants Br. at 14. We disagree. The Court in *Linden* did not decide in the first instance what procedures could be used to establish majority support, but whether the Board abused its discretion in determining that authorization cards could not be used. The Company has not explained, and we do not see any reason, why it is irrational for the Board to conclude that voting by authorization cards was not reliable to establish majority support but certification pursuant to Pennsylvania law was reliable.

established by board certification following an election, *compare Lincoln Park*, 116 F.3d at 219 *with* 43 Pa. Cons. Stat. § 1101.605, and allow for the filing of decertification provisions in appropriate instances, *compare* 29 U.S.C. 159(e) *with* 43 Pa. Cons. Stat. § 1101.607. Indeed, due to similarities between the laws, the Pennsylvania Supreme Court often looks to the NLRA in interpreting the PERA. *See Commonwealth of Pa. Office of Admin. v. PLRB.*, 916 A.2d 541, 550 (Pa. 2007).[7]

The purpose of the successorship doctrine is to encourage stability at a time of transition. As the Supreme Court explained in approving the Board's creation of the successorship doctrine,

> [d]uring a transition between employers, a union is in a peculiarly vulnerable position. It has no formal and established bargaining relationship with the new employer, is uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it. While being concerned with the

---

[7] There is also no indication that Cambria County doubted Local 1305 was an appropriate bargaining counterparty at any time during its ownership of the facility. Following its certification under Pennsylvania law, Local 1305 entered into a series of collective-bargaining agreements with Cambria County, the most recent of which expired in December 2008. The parties attempted to negotiate a successor agreement but were unsuccessful.

16

future of its members with the new employer, the union also must protect whatever rights still exist for its members under the collective-bargaining agreement with the predecessor employer. Accordingly, during this unsettling transition period, the union needs the presumptions of majority status to which it is entitled to safeguard its members' rights and to develop a relationship with the successor.

*Fall River*, 482 U.S. at 39 (footnote omitted). We see no reason why the Board's determination that this policy applies equally to a public-to-private transition is irrational or inconsistent with the Act. We therefore join other Courts of Appeals in approving the application of the successorship doctrine in this context. *See Cmt'y Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1084 (D.C. Cir. 2003); *Lincoln Park*, 116 F.3d at 218–20.

### C. Refusal to Hire

The Board also concluded that the Company, as a single employer, engaged in an unfair labor practice by refusing to hire the five former Laurel Crest employees. Section 8(a)(3) of the Act provides in pertinent part that it is "an unfair labor practice for an employer[,] . . . by discrimination in regard to hire or tenure of employment[,] . . . to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). As we have previously explained,

17

> [t]he employer's motivation in [refusing to hire] the employee is essential to finding a violation [of this section], and the Board may look to both direct and circumstantial evidence to determine whether an unlawful motive exists. Relevant factors include whether the employer knew about the employee's union activity; whether the employer was hostile towards the union; the timing of the employee's [no-hire decision]; and the employer's reasons (or lack thereof) for [refusing to hire] the employee.

*NLRB v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 122 (3d Cir. 1991) (citations omitted). The Board found that the Company's refusal to hire was motivated by the requisite antiunion animus. That inference was primarily supported by findings that (a) there was a gross disproportion between the percentage of Local 1305 officers hired (20 percent) and the percentage of other former employees hired (80 percent), and (b) the Company's justifications for not hiring the five employees were mere pretext.

The Company argues that the determination by the Board that the Company violated § 8(a)(3) should be reversed because the Board's finding that the Company's justifications were mere pretext is not supported by substantial evidence.[8]

---

[8] The Company also argues that the Board's determination that the Grane representatives who made the no-hire decisions knew of the employees' union activities was not supported by

18

More specifically, the Company maintains the Board erred in discrediting the testimony of the two Grane representatives—Beth Lengle and Vivian Andrascik—responsible for the no-hire decisions. Because we believe these credibility determinations were not patently unreasonable, we decline to reverse the Board.

Both witnesses testified that their no-hire decisions were based largely on discussions they had with other Laurel Crest employees. Lengle testified that she decided not to hire four of the employees on the basis of negative references she received from Rebecca Nelen, Laurel Crest's director of nursing, during in-depth discussions. Andrascik testified that she declined to hire the fifth employee based largely on negative references she received from that employee's former co-worker, Nancy McMahon.

The Board determined that these proffered reasons were pretextual because the testimony was contradicted by other evidence and was not internally consistent. Nelen, for example, had a different recollection of her interactions with Lengle. She testified that she only spoke with Lengle briefly, and that she did not recall having any conversations with Lengle about individual employees and their job performance. She also testified that because she had only been director of nursing for about a year, and had been busy with other matters during that time, she had not yet had time to get to know the employees by the time the alleged conversations were supposed to have taken place.

---

substantial evidence. We have reviewed the record and consider it sufficient to support the Board's inference of knowledge.

19

The Company contends that it was improper for the Board to discredit the testimony of Lengle and Andrascik because evidence in the record corroborates that testimony. The Company points in particular to the fact that some of the same criticisms Lengle and Andrascik cited as reasons for not hiring the employees were contained in their personnel files.[9] According to the Company, because Lengle and Andrascik did not review these files prior to making the relevant employment decisions, they must have been recounting information provided to them by Nelen and McMahon. This corroboration, the Company suggests, undermines fatally the Board's finding that Lengle's and Andrascik's testimony was not credible.

That some evidence corroborates a witness's testimony while other evidence contradicts it, however, does not make the Board's determination to discredit that testimony patently unreasonable. We are not charged with reweighing the evidence in this matter and making an independent determination as to whether these witnesses were credible. The Board considered this potentially corroborating evidence, and decided it was insufficient to render Lengle's and Andrascik's testimony credible. In particular, the Board noted that these witnesses, consistent with the view that the

---

[9] The Company also objects to the discrediting of Lengle's testimony on the ground that Nelen only said she did not recall any meetings, not that they did not occur, and that, when pressed, Nelen admitted she may have spoken with Lengle. Witnesses, however, are often reticent to speak in absolutes when testifying under oath. As the Board noted, the fact that Nelen took care to correct her testimony to ensure she was not perjuring herself hardly requires a finding by the Board that her testimony was untrustworthy.

no-hire justifications were pretextual, could have consulted the personnel files after making the no-hire decisions but prior to testifying. We do not consider this rationale unreasonable, and thus do not disturb it.

*  *  *  *  *

We summarize our holdings.

1. The Board's determination that Grane and Cambria Care are a single employer, and thus jointly and severally liable for violations of the NLRA committed by either of them, is supported by substantial evidence.

2. The Board acted consistently with the NLRA in applying the successorship doctrine to find that the Company had a duty to bargain with Local 1305.

3. The Board's ruling that the Company violated the NLRA by refusing to hire five former Laurel Crest employees is supported by substantial evidence.

We, therefore, deny the Company's petition for review and grant the Board's cross-petition for enforcement of its decision and order.