**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 18-2013, 18-2105

_____

COUNTY CONCRETE CORPORATION,
Petitioner/Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross-Petitioner

_____

Appeal from the National Labor Relations Board
(NLRB-1 : 22-CA-171328)

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 18, 2019

_____

Before: SHWARTZ, KRAUSE, and BIBAS, Circuit Judges.

(Filed: March 28, 2019)

_____

OPINION[*]

_____

SHWARTZ, Circuit Judge.

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

County Concrete Corporation petitions for review of the National Labor Relations Board's ("NLRB") decision that the company violated § 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) & (5), by (1) unilaterally modifying the dues-checkoff provisions of its collective-bargaining agreements ("CBAs") with the union and (2) refusing to collect dues as required under those CBAs. The NLRB ordered that County Concrete desist from unilaterally modifying the collective-bargaining agreements and reimburse the union for its untimely collection of dues. Because the NLRB's decision is supported by substantial evidence and its precedent, we will deny County Concrete's petition for review and grant the NLRB's cross-application to enforce.

## I

## A

County Concrete manufactures and sells ready-mix concrete in New Jersey. In May 2009, County Concrete recognized Local 863, International Brotherhood of Teamsters, as "the exclusive bargaining representative" of certain County Concrete "drivers, mechanics, laborers and heavy equipment operators." J.A. 318.

County Concrete and Local 863 negotiated five CBAs for the company's five facilities. The President and owner of County Concrete, John Crimi, and Local 863's Secretary Treasurer, Alphonse Rispoli, participated in the negotiations.

During the discussions, the parties agreed to use a CBA template that Local 863's predecessor union had with County Concrete. The template included "standard language" for union dues: "During the life of this Agreement the Employer agrees to

2

deduct once each month from the employees' wages and remit to the proper officers of the Union monthly dues and initiation fees as membership dues . . . ." See, e.g., J.A. 324; see also J.A. 139. This provision is known as a dues-checkoff clause.

County Concrete made its "final offer" to Local 863 in May 2015. J.A. 149. The final offer proposed, among other things, a wage schedule and pension plan, but mentioned no changes to the template's dues-checkoff clause. The members of Local 863 approved County Concrete's final offer.

Rispoli called Crimi to tell him that the union accepted the final offer. Rispoli testified that he and Crimi agreed that November 2015 would mark the "start of the term of the contract[s]." J.A. 155. According to Rispoli, they also orally agreed that County Concrete would start deducting dues from the employees' wages and remitting them to Local 863 on January 1, 2016. Rispoli sent a letter to County Concrete confirming the January 1, 2016, dues-deductions start date.

At Local 863's request, County Concrete supplied the union with a list of employees so that Local 863 could distribute membership applications to them. The applications included a signature line for employees to authorize dues deductions from their wages. Between December 2015 and January 2016, Local 863 gathered more than 100 signed authorizations from 146 employees, but it had some difficulties collecting signatures from the remaining employees because of inaccuracies in the list.

The membership application stated that authorization was "voluntary" and that it was "not conditioned on [an employee's] present or future membership in the Union." J.A. 518. Local 863, however, did not inform employees that they could opt out of being

3

full members of the union and instead be "financial core" members. J.A. 206-07. A financial core member is an employee who does "not want to be a full union member" and is "not subject to union discipline." Quick v. NLRB, 245 F.3d 231, 237 n.2 (3d Cir. 2001) (quotation marks omitted). Local 863 also did not notify the employees that a financial core member could object to union expenditures unrelated to collective-bargaining activities.

Eventually, County Concrete sent Rispoli copies of the CBAs for signature. The CBAs contained the dues-checkoff clause under Article 3, which stated:

> This Article 3 is effective January 1, 2016. Thereafter and during the remainder of the life of this Agreement . . . the Employer agrees to deduct once each month from the employees' wages and remit to the proper officers of the Union monthly dues . . . levied by the . . . Union.

J.A. 535, 550, 565, 580, 595. The CBAs also contained a "union security" clause, which stated:

> Any present or future employee who is or hereafter becomes a member of the Union shall remain a member of the Union during the terms of this Agreement as a condition of his employment and continued employment.

J.A. 534, 549, 564, 579, 594.

In the letter accompanying these unsigned CBAs, County Concrete wrote: "We have . . . added the effective date of November 8, 2015 . . . and set January 1, 2016 as the start date for dues." J.A. 531. Rispoli signed the agreements and mailed them to Crimi in mid-January 2016.

By early February 2016, County Concrete informed Local 863 that it had not received signed authorizations to deduct wages from all employees, and it did not know

4

which employees chose to be financial core members. In response, Local 863 provided County Concrete with a "complete dues-accounting sheet, listing each union member for whom they had an authorization card, with their wage rate, and the dues owed." Resp't's Br. at 8.

County Concrete then (1) informed Rispoli that because not all employees signed the authorizations, it would change the effective date of the dues-checkoff clause so that dues deductions would start in March 2016, not January 2016; (2) returned the CBAs to Local 863 with the handwritten March 2016 date change to the dues-checkoff clause; and (3) asked Rispoli to agree to the change. Rispoli declined and returned the CBAs to County Concrete, changing the effective date back to January 1, 2016.

Although County Concrete collected and remitted dues to Local 863 for both March and April 2016, it did not do so for January and February. As a result, Local 863 filed an unfair labor practice charge against County Concrete.

B

An Administrative Law Judge ("ALJ") held a hearing. The ALJ received documents and heard testimony about the negotiations and the collection of dues checkoff forms. County Concrete also offered testimony purporting to show that Local 863 coerced employees to sign the forms. In this regard, Crimi testified that he learned that a union steward had gone to employees, "telling them that if they're a financial core member . . . they're not going to be represented by [Local 863]" and that they "can't go on union jobs." J.A. 248. One County Concrete employee also testified to this effect.

5

Crimi testified that Rispoli said that he would tell the steward to stop pressuring employees to sign the forms.

The ALJ held that: (1) County Concrete and Local 863 had a "meeting of the minds" that the effective date of the checkoff clause would start on January 1, 2016; (2) the absence of formal notice from the union that the employees had a right to be a dues-paying non-member did not bar Local 863 from relief; (3) Local 863 did not coerce employees to sign the checkoff authorization forms; and (4) County Concrete violated § 8(a)(5) and (1) of the NLRA by "making a unilateral change" to the CBAs, and "failing and refusing to collect properly authorized dues from employees" in January and February 2016. J.A. 30. To remedy these violations, the ALJ recommended an order directing County Concrete to, among other things, "desist from . . . [m]aking unilateral changes to agreed-upon [CBAs]" and reimburse Local 863 for dues that it failed to collect and remit in January and February 2016. J.A. 30-31.

County Concrete filed exceptions to the ALJ's recommended order with the NLRB. The NLRB adopted most of the ALJ's findings and conclusions, and adopted, with rewording, the recommended remedy.

County Concrete petitions for review of the NLRB's decision, and the NLRB has filed a cross-application for enforcement of its order. Local 863 has intervened to support the NLRB's ruling.

II[1]

We exercise plenary review over both "questions of law and the NLRB's application of legal precepts." NLRB v. ImageFIRST Unif. Rental Serv., Inc., 910 F.3d 725, 732 (3d Cir. 2018). "Factual findings by the NLRB are reviewed under the substantial evidence standard." Id. Substantial evidence "means relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Id. The familiar Chevron framework applies to the NLRB's interpretations of the NLRA. Holly Farms Corp. v. NLRB, 517 U.S. 392, 398-99 (1996).

III

Our analysis of the petition for review and cross-application proceeds in three parts. First, we determine whether there is substantial evidence to conclude that the parties agreed that County Concrete would start deducting dues and remitting them to Local 863 in January 2016. Second, we analyze whether County Concrete had grounds for not complying with its dues-collection obligation. Third, we determine whether substantial evidence supports the NLRB's conclusion that County Concrete unilaterally modified the CBAs.

A

"In the field of labor relations, the technical rules of contract law do not determine the existence of an agreement." Mack Trucks, Inc. v. Int'l Union, United Auto, Aerospace & Agric. Implement Workers of Am., 856 F.2d 579, 591-92 (3d Cir. 1988).

---

[1] The NLRB had jurisdiction under 29 U.S.C. § 160(a). We have jurisdiction under 29 U.S.C. § 160(e) and (f).

"[T]o reach a labor agreement, the parties must establish a meeting of the minds." Id. at 591. If the parties "agree[] to the substantive terms and conditions of a contract, even though it may not be reduced to writing, they can nevertheless be held to its terms." NLRB v. N.Y.-Keansburg-Long Branch Bus Co., 578 F.2d 472, 477 (3d Cir. 1978). "Whether or not an agreement has been reached between two parties is a question of fact for the [NLRB] to determine." Capital-Husting Co. v. NLRB, 671 F.2d 237, 243 (7th Cir. 1982).

Applying these principles, we hold that substantial evidence supported the NLRB's conclusion that the parties agreed that the effective date of the dues-checkoff clause was January 2016, not March 2016. The record reveals:

- County Concrete and Local 863 initially agreed to a CBA template used by a predecessor union that included a dues-checkoff clause.

- When the parties began finalizing the CBAs, Rispoli and Crimi orally agreed that the dues deductions would start in January 2016.

- Rispoli sent a confirmatory letter to County Concrete afterwards, memorializing the parties' understanding that the deductions would start in January 2016, and County Concrete did not oppose this date.

- County Concrete sent Local 863 five CBAs, all of which provided that the start date for deductions would be January 1, 2016.

- County Concrete confirmed in a letter accompanying the CBAs that "January 1, 2016 [was] the start date for dues." J.A. 531.

- Nothing in the CBAs authorized a unilateral modification of its effective date.

8

Thus, substantial evidence supports the ALJ and NLRB's conclusion that there was a meeting of the minds that January 2016 was the effective date for the dues-checkoff clause.

B

County Concrete nonetheless offers five reasons why the dues-checkoff clause was not enforceable in January and February 2016, but none are persuasive.

First, County Concrete argues that Crimi's refusal to sign the collective bargaining agreements until late February 2016 means that the dues-checkoff clause's effective date was March 2016. "[T]echnical rules of contract," however, do not govern the terms of a collective bargaining agreement. Mack Trucks, 856 F.2d at 591-92. Indeed, because the parties "agreed to the substantive terms and conditions" early on, a written memorialization was not even necessary. N.Y.-Keansburg-Long Branch, 578 F.2d at 477; see also Mack Trucks, 856 F.2d at 592 ("Adoption of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound."). As a result, the lack of a signature was not fatal to the parties' agreement that January 1, 2016, would mark the start of dues deductions and remittance.

Second, contrary to County Concrete's assertion, the presence of a union-security clause does not change the company's obligation under the dues-checkoff clause. County Concrete mistakenly asserts that a union-security clause and dues-checkoff clause operate interdependently, and that because a "union-security clause may not be applied retroactively[,]" Local 32B-32J, SEIU, 266 N.L.R.B. 137, 138 (1983), the dues-checkoff

9

clause also cannot be applied retroactively.[2]  This argument fails because a union-security clause and a dues checkoff clause are different.  IBEW Local 2088, 302 N.L.R.B. 322, 328 (1991) ("We recognize that paying dues and remaining a union member can be two distinct actions.").

A union-security clause "establish[es] and maintain[s] a union shop."  Quick, 245 F.3d at 243.  A dues checkoff clause does not.  Shen-Mar Food Prods., Inc., 221 N.L.R.B. 1329, 1330 (1976).  Instead, "it is simply an administrative convenience for the collection of dues."  Anheuser-Busch, Inc. v. Int'l Bhd. of Teamsters, Local 822, 584 F.2d 41, 43 (4th Cir. 1978); see also Int'l Union of Operating Eng'rs Local 399 v. Village of Lincolnshire, 905 F.3d 995, 1003 (7th Cir. 2018) (noting that checkoff clauses "facilitate payments" when employees decide to join a union).  Thus, although there would be no dues-checkoff if there were no union, a union-security clause and a dues-checkoff clause serve different purposes, and the fact that one cannot be retroactive is irrelevant.

We also observe that the union-security and dues-checkoff clauses here are not written to be interdependent.  Neither references the other either explicitly or implicitly.  We do not foreclose the possibility that our approach might be different in a case where the clauses are written to be interdependent.

---

[2] Although the NLRB concluded that the union in Local 32B-32J committed unfair labor practices by causing an employer to "deduct union dues from the wages of its employees for a period prior to 30 days after the execution of their collective-bargaining agreement," 266 NLRB at 139, its reasons do not apply here because the parties agreed before the agreements were signed that County Concrete would start deducting and remitting dues in January 2016.

10

Third, Local 863's failure to notify employees of their right to be financial core members, see generally NLRB v. Gen. Motors Corp., 373 U.S. 734 (1963), and their right to object to union expenditures unrelated to collective bargaining, see generally Commc'n Workers of Am. v. Beck, 487 U.S. 735 (1988), does not relieve County Concrete of its obligation to deduct and remit dues. Even when a union fails to provide these notices, it is entitled to collect dues for chargeable, representational activities. Dist. Councils Nos. 8, 16, & 33 of the Int'l Bhd. of Painters & Allied Trades, 327 N.L.R.B. 1020, 1021 (1999). Because the union is still entitled to collect these dues, the employer is still obligated to deduct and remit them.

We need not decide the exact extent of this obligation today: whether an employer must deduct and remit (1) full-member dues, or (2) only dues for chargeable expenses, to a union that fails to notify employees of their Beck and General Motors rights. We note only that District Councils Nos. 8, 16, & 33 obligates an employer to collect what a union is entitled to, as determined by the parties' collective-bargaining agreement and the NLRA. Here, County Concrete failed to deduct and remit any dues to Local 863. That failure meets neither standard and is inexcusable.

We also caution employers against seeking to vindicate their employees' Beck and General Motors rights unilaterally. See Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 790 (1996) (observing that the NLRB and courts are rightly leery of an employer's attempts to vindicate its employees' rights under the NLRA). The beneficiary of these notices is the employee, not the employer. An employee who does not receive adequate notice can file an unfair labor practices charge against the union and receive

11

reimbursement of dues to the extent that the union participated in "nonrepresentational activities." Teamsters Local 738 (E.J. Brach Corp.), 324 N.L.R.B. 1193, 1194 (1997).

Fourth, County Concrete's assertion that the NLRB erred in ruling that the record lacked sufficient evidence to show that Local 863 obtained the checkoff authorizations by coercion also fails. County Concrete points to testimony that (1) a union steward informed employees that "they would lose their job" if they did not sign the checkoff authorization forms, see Pet'r's Br. at 29; and (2) some County Concrete employees desired to be financial-core members but became regular members. Substantial evidence, however, supports the NLRB's conclusion that Local 863 obtained the checkoff authorizations without coercion. To start, the ALJ found not credible the testimony of the one employee who was told that he "couldn't work at County Concrete" if he did not sign the dues checkoff authorization. J.A. 263. "The ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable," St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) (quotation marks and alteration omitted), and here County Concrete has not even challenged them.

The only other evidence of Local 863's allegedly coercive behavior came from Crimi, who testified that a Local 863 steward pressured employees into signing the authorization forms. Crimi did not explain how he learned that a steward coercively gathered the signatures of over one hundred County Concrete employees at five different locations in the span of several weeks. A "reasonable mind" could thus conclude that there was insufficient evidence of coercion. See ImageFIRST, 910 F.3d at 732.

12

Fifth, even if some employees desired to be financial-core members but were listed as full members, the uncertainty of their membership status did not relieve County Concrete of its obligation to start deducting dues in January 2016. Rather than refuse to deduct and remit dues for all employees for two months, County Concrete could have, for instance, placed the disputed dues deductions in escrow. See Nathan's Famous of Yonkers, Inc., 186 N.L.R.B. 131, 133 (1970).

While confusion about membership status does not excuse an employer from deducting and remitting dues, the lack of a signed dues-checkoff authorization does. Indeed, "the [NLRA] prohibits an employer from deducting and remitting union dues unless the employee has executed a written dues-checkoff authorization" and the employer is "presented with [that] signed authorization." Williams Pipeline Co., 315 N.L.R.B. 630, 632 (1994). In January 2016, County Concrete did not have signed authorizations from a considerable number of employees. It still did not have some of those employees' authorizations by late February. As the ALJ recognized, for those employees who had not provided written authorizations, County Concrete had no obligation to deduct or remit dues, and the NLRB's forthcoming compliance stage will be the opportunity for determining, among other things, County Concrete's resulting obligations concerning those employees.

This does not excuse County Concrete's wholesale ignoring the dues-checkoff clause's effective date of January 1, 2016. While County Concrete had no obligation to deduct dues from employees whose checkoff authorizations it did not have, it still had to deduct and remit dues from those employees whose authorizations it did have, beginning

13

January 1, 2016.  To the extent that the membership status of an employee who had signed an authorization was in question, County Concrete should have deducted and remitted at least chargeable dues and put the remainder of the full-member dues in escrow until the employee's status could be verified.  See Nathan's Famous, 186 N.L.R.B. at 133.

In sum, County Concrete presented no reasons that justified ignoring the January 1, 2016, dues-checkoff clause's effective date.[3]

C

We now consider whether County Concrete's unilateral modification of the January 1, 2016, effective date for dues collection and its failure to collect dues violate § 8(a)(5) and (1) of the NLRA.

Section 8(a)(5) provides that it is an "unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees."  29 U.S.C.  § 158(a)(5); accord Citizens Publ'g & Printing Co. v. NLRB, 263 F.3d 224, 233 (3d Cir. 2001).  Section 8(d), in turn, "augment[s]" § 8(a)(5), requiring "an employer to bargain over 'wages, hours, and other terms and conditions of employment.'"  Citizens Publ'g; 263 F.3d at 233 (quoting 29 U.S.C. § 158(d)).  Dues-checkoff clauses are "mandatory subjects of bargaining."  Int'l Union of Operating Eng'rs, 905 F.3d at 1002.  An employer violates § 8(a)(5) "if, without bargaining to impasse, it effects a unilateral

---

[3] Because County Concrete first raised in its reply brief its argument that it had no obligation to deduct dues from employee wages in January 2016 based on Local 863's alleged failure to assess dues in January 2016, the argument is waived.  Garza v. Citigroup Inc., 881 F.3d 277, 284-85 (3d Cir. 2018).

14

change of an existing term or condition of employment." Citizens Publ'g, 263 F.3d at 233 (quoting Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991)). Such an employer "also derivatively violates § 8(a)(1) of the Act, which makes it an unfair labor practice 'to interfere with, restrain, or coerce employees in the exercise of' their statutory federal labor rights." Id. at 233 (quoting 29 U.S.C. § 158(a)(1)).

Substantial evidence supports the NLRB's conclusion that County Concrete unilaterally modified the CBAs in violation of § 8(a)(5) and (1). As discussed above, there was substantial evidence to support the conclusion that: (1) the parties agreed that the dues-checkoff clause would become effective on January 1, 2016; (2) County Concrete announced that it was changing the date to March 1, 2016; (3) Local 863 did not agree to a later effective date for the dues-checkoff clause; and (4) County Concrete did not collect and remit dues for January and February 2016 from employees whose signed dues-checkoff authorizations it had received. Accordingly, County Concrete effected a "unilateral change" of the dues-checkoff clause and failed to comply with its original terms. See Citizens Publ'g, 263 F.3d at 233. The NLRB thus did not err in concluding that County Concrete violated both § 8(a)(5) and (1) of the NLRA. Hearst Corp. Capital Newspaper Div. & Local 31034, Newspaper Commc'n Workers of Am., CFL-CIO, 343 N.L.R.B. 689, 693 (2004) ("It is well established that an employer violates Section 8(a)(5) by ceasing to deduct and remit dues in derogation of an existing contract.").

15

IV

For these reasons, we will deny County Concrete's petition for review and grant the NLRB's cross-application for enforcement.