**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____


Nos. 15-2229 and 15-2321
_____


ADVANCED DISPOSAL SERVICES EAST, INC.,
Petitioner in 15-2229


v.


NATIONAL LABOR RELATIONS BOARD,
Petitioner in 15-2321
_____


On Petition for Review and Cross-Application
for enforcement of an Order of
the National Labor Relations Board
(NLRB No. 04-CA-145936)
_____


Argued March 2, 2016


Before: SMITH and HARDIMAN, *Circuit Judges*[*]

_____

[*] The Honorable Dolores K. Sloviter assumed inactive status on April 4, 2016, after the argument and conference in this

(Filed: April 21, 2016)

Daniel D. Barker, Esquire [ARGUED]
Jackson Lewis
1 South Pinckney Street
Suite 930
Madison, WI  53703

John E. MacDonald, Esquire
Constangy Brooks Smith & Prophete
939 Lenox Drive
Suite 206
Lawrenceville, NJ  08648
        *Counsel for Petitioner*

Linda Dreeben, Esquire
Kellie Isbell, Esquire  [ARGUED]
Kira D. Vol, Esquire
Eric Weitz, Esquire


National Labor Relations Board
Appellate and Supreme Court Litigation Branch

---

case, but before filing of the opinion.  This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

2

1015 Half Street, S.E.
Washington, DC 20570
    *Counsel for Respondent*

—————————

OPINION

—————————

SMITH, *Circuit Judge*.

Advanced Disposal Services East, Inc.
("Advanced") petitions for review of an order of the
National Labor Relations Board ("NLRB" or "the
Board") which held that Advanced violated sections
8(a)(1) and 8(a)(5) of the National Labor Relations Act
("NLRA"), by "refus[ing] to bargain collectively with the
representatives of [its] employees." 29 U.S.C.
§ 158(a)(5). Before this Court, Advanced not only
challenges the merits of the NLRB's determination but
also argues that the NLRB Regional Director who
facilitated the contested election lacked the authority to
do so. Advanced claims that because Director Dennis
Walsh was appointed at a time when the Board lacked a
valid quorum, his actions were *ultra vires*. *See generally
NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).[1] The

_____

[1] In *Noel Canning*, the Supreme Court held that the January 4,
2012, recess appointments of NLRB Members Block, Griffin,
and Flynn were invalid. *NLRB v. Noel Canning*, 134 S. Ct.

3

NLRB cross-applies for enforcement of its order.

Precisely because the Supreme Court's decision in *Noel Canning* was so "rare and remarkable," Bryan J. Leitch, *NLRB v. Noel Canning: The Separation-of-Powers Dialogue Continues*, 2014 Cato Sup. Ct. Rev. 221, 259, the litigation it has spawned raises novel questions that have yet to be addressed by this Court. This case, in particular, requires us to consider several issues which, while not directly related to *Noel Canning*, arose only because the invalid recess appointments of several NLRB members created a situation in which the validity of hundreds of NLRB orders and other official actions were cast into doubt. *See, e.g.,* Ben James, *Noel Canning Ruling Casts Doubt on Regional Directors*, Law360 (June 27, 2014, 9:11 PM), http://www.law360.com/articles/552592/noel-canning-ruling-casts-doubt-on-regional-directors.

Specifically, we will consider three questions.

---

2550, 2573 (2014). As a result, the Board was not properly constituted until August 12, 2013, when three new members were sworn in. Accordingly, all NLRB decisions in the interim violated the quorum and three-member-composition requirements of 29 U.S.C. § 153(b). *See New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 687-88 (2010); *NLRB v. New Vista Nursing & Rehab.*, 719 F.3d 203, 208-09 (3d Cir. 2013), *reh'g granted*, 2014 U.S. App. LEXIS 15360 (3d Cir. Aug. 11, 2014).

4

First, did Advanced forfeit its right to challenge Director Walsh's authority by not raising the issue prior to the representation election? Second, did Advanced's execution of a Stipulated Election Agreement constitute an accession to Director Walsh's authority, preventing Advanced from now challenging that authority? Third, if we conclude that Director Walsh originally lacked authority to oversee the election, were his and the Board's attempts to ratify their unauthorized conduct sufficient?

After considering the arguments put forward by both sides, we conclude that Advanced did not lose the ability to challenge Director Walsh's authority by failing to raise this issue during the representation proceeding, nor did the Stipulated Election Agreement constitute an implied accession to Director Walsh's authority. We also hold that Director Walsh and the Board both properly ratified their previously unauthorized actions.

We must next address the merits of Advanced's Petition for Review. In doing so, we ask whether substantial evidence supported the Board's determination that certain allegedly disruptive conduct did not "destroy[] the laboratory conditions of the election" and "render[] a free expression of choice of representation impossible." *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1011 (3d Cir. 1981). Upon careful review of the record, we hold that substantial evidence supports the Board's determination and the Hearing

5

Officer's findings. We will therefore deny the petition for review and will grant the NLRB's cross-application for enforcement.

## I.     Procedural History

On March 5, 2014, the Teamsters Local Union No. 384 filed a representation petition with Director Walsh seeking to represent a unit of workers at three of Advanced's facilities. The proposed unit consisted of approximately 120 full-time and regular part-time drivers, helpers, and mechanics. The Union and Advanced entered into a Stipulated Election Agreement on March 13, 2014. On April 16 and 17, 2014, secret ballot elections were held at all three of Advanced's facilities, with sixty voters supporting unionization and fifty-eight opposing it.[2] Advanced challenged the election outcome and was granted a hearing on May 19, 2014, before Hearing Officer Devin Grosh. On July 3, 2014, Grosh issued his report, recommending that Advanced's objections be overruled. On December 16, 2014, a three-member panel of the NLRB affirmed Grosh's report and overruled all of Advanced's additional objections to Grosh's report.

In order to preserve its right to appeal, Advanced refused to bargain with the now-certified bargaining unit. *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 404 (1940);

---

[2] There was also one contested ballot which was not counted.

*United Fed'n of Coll. Teachers, Local 1460 v. Miller*, 479 F.2d 1074, 1075 (2d Cir. 1973) ("It has long been held that N.L.R.B. certification proceedings do not result in reviewable final orders."). Director Walsh thus filed a Complaint and Notice of Hearing on February 19, 2015, seeking to enforce the Union's certification and force the company to bargain. Ultimately, a three-member panel of the NLRB issued a Decision and Order on May 8, 2015, concluding that Advanced had violated § 158(a)(5) by refusing "to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). Advanced filed a petition for review on May 15, 2015, and the NLRB cross-applied, seeking enforcement of its order.[3]

## II.    Forfeiture

We must determine whether Advanced forfeited the right to challenge Director Walsh's authority to conduct the election by failing to properly raise the issue before the Board. The NLRB argues that if Advanced had timely raised this issue, it could have "correct[ed] the flaw before the election." The NLRB also cites precedent suggesting that belated challenges like this are

---

[3] We have jurisdiction to review the Board's Order under 29 U.S.C. § 160(e), (f). "The Board's legal determinations are subject to plenary review, but we will uphold the Board's interpretations of the Act if they are reasonable." *MCPC Inc. v. N.L.R.B.*, 813 F.3d 475, 482 (3d Cir. 2016).

untimely and thus are forfeited on appeal.

We disagree with the Board's conclusion that a belated attack on Director Walsh's authority can be forfeited. Even though this challenge was not properly preserved below,[4] we hold that a challenge like this one, which goes to the authority of the Board to act, constitutes an "extraordinary circumstance" under § 160(e) and can thus be raised for the first time on appeal. *See Noel Canning v. NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013), *aff'd on other grounds* 134 S. Ct. 2550 (2014).

Turning to § 160(e),[5] we recognize that "a court of appeals has no power, *sua sponte*, to find objectionable a portion of any NLRB order, if no objection was raised before the Board and failure to object was not excused by any 'extraordinary circumstances.'" *Oldwick Materials, Inc. v. NLRB*, 732 F.2d 339, 342 (3d Cir. 1984). This is so because § 160(e) is a jurisdictional administrative exhaustion requirement designed to ensure that any issue

---

[4] Even though Advanced raised this challenge before the Board, it was not raised prior to the election, as required by the Board.

[5] 29 U.S.C. § 160(e) states in relevant part: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

raised on appeal was first presented to the Board, absent "extraordinary circumstances." *See* 29 U.S.C. § 160(e); *Oldwick Materials*, 732 F.2d at 341 ("Application of section 10(e) is mandatory, not discretionary. . . . [P]etitioner's failure to object or to urge 'extraordinary circumstances' before both the Board and this court requires foreclosure of any judicial consideration of objections in the enforcement proceeding."). Section 160(e)'s status as a jurisdictional limitation on our authority is nothing new. As the Supreme Court held in *Woelke & Romero Framing, Inc. v. NLRB*, if an issue was not raised during the proceedings before the Board, "judicial review is barred by § 10(e) of the Act, 29 U.S.C. § 160(e)." 456 U.S. 645, 665 (1982). The Court then explained that failure to satisfy § 160(e) meant that "the Court of Appeals lack[ed] *jurisdiction* to review objections that were not urged before the Board." *Id.* at 666 (emphasis added). Because Advanced did not raise its objection to Director Walsh's authority at the proper time, we must decide whether its challenge constitutes an "extraordinary circumstance" under § 160(e).

In making this determination, we are cognizant of competing authority on this issue. In *Noel Canning*, the D.C. Circuit noted that "the objections before us concerning lack of a quorum raise questions that go to the very power of the Board to act and implicate fundamental separation of powers concerns." 705 F.3d at 497. Thus, "they are governed by the 'extraordinary

9

circumstances' exception to the 29 U.S.C. § 160(e) requirement and therefore are properly before us for review." *Id.* In other words, the D.C. Circuit held that a challenge which goes to the very power of the Board to act is by definition an extraordinary circumstance.

The D.C. Circuit has since re-affirmed this conclusion, holding in *SSC Mystic Operating Co., LLC v. NLRB*, 801 F.3d 302, 308 (D.C. Cir. 2015), and *UC Health v. NLRB*, 803 F.3d 669, 672-73 (D.C. Cir. 2015), that challenges to a Regional Director's authority also implicate the very power of the Board to act and thus constitute extraordinary circumstances. As the D.C. Circuit made clear, "[b]ecause this challenge and the argument that Regional Directors may not conduct elections while the Board lacks a quorum are both premised on the Board's lack of authority to act, we believe both are properly before us no matter when they were first raised." *SSC Mystic*, 801 F.3d at 308. The factual similarities between Advanced's claim and both *SSC Mystic* and *UC Health* further support our conclusion. In both of the above cases, an employer challenged the ability of a Regional Director to conduct the election in question because, at the time of the election, the NLRB lacked a valid quorum as a result of the Supreme Court's decision in *Noel Canning*. This was deemed a challenge that "directly involves the question of whether the Board's lack of a quorum stripped the Regional Directors of power" and thus "can be raised on

10

review even when . . . not raised before the agency." *UC Health*, 803 F.3d at 672-73.

But the similarity does not stop there. In *SSC Mystic*, the employer made one additional argument that had not been raised in *UC Health*. First, the employer noted that even though the NLRB's Regional Director was *initially* validly appointed, when the NLRB reorganized its regions in 2012, his jurisdiction expanded to cover additional territory. This occurred at a time when the NLRB did not have a proper quorum. Thus, "Mystic insists that because the Board had no quorum in 2012, it could not validly appoint Kreisburg to his new post as the Regional Director of new Region 1." *SSC Mystic*, 801 F.3d at 308. Again, rebuffing the NLRB's suggestion that this argument was waived, the D.C. Circuit held that this challenge was "premised on the Board's lack of authority to act" and was thus properly before the court "no matter when [it was] first raised." *Id.*

In contrast to the cases just described, the Eighth Circuit in *NLRB v. RELCO Locomotives, Inc.* held that the validity of the Board's composition is *not* an extraordinary circumstance under § 160(e). 734 F.3d 764 (8th Cir. 2013). Before parsing out the differences between *RELCO* and *SSC Mystic*, however, we note one similarity. The Eighth Circuit agrees that § 160(e) constitutes an "explicit jurisdictional exhaustion requirement" and recognizes that absent satisfaction of

11

§ 160(e), courts are not permitted to entertain challenges not properly raised before the Board. *Id.* at 798. Beyond this point of agreement, however, the Eighth Circuit parts ways with the D.C. Circuit, concluding that a challenge to the Board's quorum requirement is not an extraordinary circumstance as defined by prior Eighth Circuit precedent. In particular, the court notes that its case law has "identified only two situations that qualify as 'extraordinary circumstances' under § 160(e)." *Id.* at 796. First, if the Board's decision is "nakedly void under the statute" and, second, if "a new development of fact or law occurs after the Board's decision or was otherwise unavailable to the party at the original hearing." *Id.*

Applying this interpretation of "extraordinary circumstances," the Eighth Circuit concluded that challenges to the composition of the NLRB fall into neither category. In addition, the court explained that a "challenge to the legal composition of an agency" should be characterized as an "affirmative defense that can be waived if it is not timely raised." *Id.* at 797. Thus, the court "decline[d] to disturb the Board's decision on the basis of RELCO's appointments clause challenge." *Id.* at 798.

Having assessed both approaches, we consider the D.C. Circuit's analysis more persuasive for two reasons. First, a challenge to § 153(b) goes to the authority of the Board to act; it is not a mere procedural technicality. This suggests that § 153(b) is more than just an

12

affirmative defense, as the Eighth Circuit determined. Indeed, it strains credulity to conclude that a situation in which the Board lacks a valid quorum yet still attempts to issue binding orders is not "extraordinary."[6]

---

[6] While not necessary to our holding in this case, we also believe that § 153(b)'s quorum requirement (the provision that was violated when Director Walsh was appointed) is a statutory limitation on the Board's authority to act, and thus can be considered "jurisdictional" in the sense that a challenge brought under it cannot be forfeited by failure to raise it before the agency. In light of the Supreme Court's holding in *Noel Canning*, the unambiguous terms of § 153(b) were violated when the NLRB appointed Director Walsh without a quorum—the statute's clarity on this point precludes any deference under *Chevron v. U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). We therefore take the late Justice Scalia's words in *City of Arlington* to heart and "rigorously apply" the "statutory limits on agencies' authority" that Congress has drawn. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013). In doing so, we note that any interpretation of § 153(b) in which the NLRB can act without a valid quorum would not be "a permissible construction of the statute." *Id.* We, therefore, believe that a violation of § 153(b) would put any contingent agency action outside the scope of that agency's *authority*; holding otherwise would be "leaving the fox in charge of the henhouse," as the late Justice Scalia put it. In other words, Congress has established "a clear line,

13

Second, and relatedly, we note that as a policy matter "it would be passing strange for an ultra vires agency action to be . . . insulated from judicial review." *Teamsters Local Union No. 455 v. NLRB*, 765 F.3d 1198, 1201 (10th Cir. 2014).[7] If we were to conclude, as the Eighth Circuit presumably would, that Advanced has forfeited its challenge, we would ultimately be overlooking and "insulating from review" the actions of an improperly constituted, quorum-less Board issuing *ultra vires* orders. In other words, we would be foreclosing a challenge to the Board's statutory authority because it was not raised before the Board—which does seem "passing strange." *Id.*; *see also Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (explaining that "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it" (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934))).

We hold, therefore, that a challenge which goes to the composition of the NLRB, and thus implicates its authority to act, constitutes an "extraordinary circumstance" under § 160(e). We are thus satisfied that

[and] the agency cannot go beyond it." *Id.* Any attempt to do so is *ultra vires* and outside the Board's statutory jurisdiction.
[7] While the Tenth Circuit made this argument in a different context, we believe similar logic applies here.

14

we have jurisdiction to entertain Advanced's challenge to the authority of Director Walsh and accordingly exercise our discretion to reach the question of whether the actions of the Board and Director Walsh are proper despite Director Walsh's invalid appointment. *See Bullock v. Dressel*, 435 F.3d 294, 300 (3d Cir. 2006) ("[W]e have the discretion to consider an issue that was waived where refusal to reach it would result in a miscarriage of justice or where the issue's resolution is of public importance. We have such a situation here." (internal citations and quotation marks omitted)).

### III. Stipulated Election Agreement

The Board also claims that Advanced "affirmatively acceded to Walsh's authority" by signing the Stipulated Election Agreement, which the Board describes as a binding contract. The Agreement lays out the election-day procedure, stating when and where the election will be held, where and for how long notice of the election will be posted, and who is eligible to vote. It also explains that the Regional Director "in his discretion" will decide (1) what language(s) will be used on the ballot and the notice of election, and (2) when and where to reschedule the election if it is postponed.

Even assuming that the Agreement binds both parties as the Board alleges, nothing in it constitutes "explicit acceptance of the agency's authority to act." *UC Health*, 803 F.3d at 673. Despite its claims to the

15

contrary, the Board cannot point to any language in the Agreement stating that Advanced "affirmatively acceded to Walsh's authority," as there is none. The only language in the Agreement referencing the Regional Director relates to his duty to supervise the election and his discretionary authority to decide procedural issues not otherwise spelled out in the Agreement. Thus, as the D.C. Circuit also concluded in *UC Health*, Advanced "did not expressly give up [its challenge to the authority of the Regional Director] when it executed the [Stipulated Election] Agreement; it merely signed a form agreement providing that the Board's regulations would govern the election." *Id.*; *see also SSC Mystic*, 801 F.3d at 308 (same). Accordingly, we hold that by signing the Stipulated Election Agreement, Advanced "did not expressly abandon anything." *UC Health*, 803 F.3d at 673.

We also reject the Board's attempt to distinguish this case from *UC Health* and *SSC Mystic*. The Board relies on the uncertainty surrounding the status of the Board's authority, explaining that the D.C. Circuit specifically mentioned the fact that the quorum issue might have been obviated by the time of the election. We find this unpersuasive for two reasons. First, based on the language in *UC Health*, which is cited in *SSC Mystic*, it appears that this was not a key factor in the court's decision, but merely an additional reason for rejecting the Board's claim. *See id.* at 673. Second, even

16

taking this argument at face value, there is no principled basis for distinguishing the two situations. As the D.C. Circuit noted,

> Indeed, when UC Health entered the Stipulated Election Agreement, . . . UC Health could not have known with any certainty that the Board had no quorum even without Senate approval for the President's appointments until the Supreme Court handed down its decision in *Noel Canning* fourteen months after the election. We will not hold UC Health responsible for failing to see the future.

*Id.* In just the same way, when Advanced entered into the Agreement on March 13, 2014, it had no way of knowing how the Supreme Court would rule in *Noel Canning* on June 26, 2014. Finally, we note that the only authority the Board relies on for the claim that a party "is estopped from attacking the propriety of an election to which it has expressly agreed" is its own, and that this authority itself is currently on review in the D.C. Circuit. *See ManorCare of Kingston, PA LLC*, 361 NLRB No. 17, 2014 WL 3919913 (Aug. 11, 2014), *petition for review filed*, Nos. 14-1166 & 14-1200, (argued Oct. 23, 2015).[8]

---

[8] We note that the same arguments regarding estoppel and accession, with citations to the Board's opinion in *ManorCare of Kingston*, were made before the D.C. Circuit

We thus see no reason to defer to the Board's position in *Kingston*.

## IV.   Ratification

Having concluded that this belated challenge to Director Walsh's authority is permissible, we turn to whether ratification by the Board and Director Walsh was sufficient to cure the quorum violation which stripped the Board, and by extension Director Walsh, of the authority to oversee the Union election.[9]   We conclude that both ratifications were sufficient.

On July 18, 2014, all five members of a *properly* constituted Board "confirm[ed], adopt[ed], and ratif[ied] *nunc pro tunc* all administrative, personnel, and procurement matters approved by the Board or taken by or on behalf of the Board from January 4, 2012, to August 5, 2013, inclusive." Next, "having considered the relevant supporting materials," the Board, "[i]n a further abundance of caution," chose to "expressly authorize[]

_____

in both *UC Health* and *SSC Mystic*.  We thus find the Board's attempt to distinguish *UC Health* and *SSC Mystic*, while relying on the same arguments it presented before the D.C. Circuit in those cases, unavailing.

[9] The Board does not attempt to argue that Walsh had the authority to act at the time of the election.  Instead, the Board only claims that his later actions constituted a ratification or affirmation of his earlier conduct, thus curing what the Board seems to admit was a "defect in Walsh's appointment."

18

the . . . selection of Dennis Walsh as Regional Director for Region 4." This alleged ratification was followed closely by that of Director Walsh, who, on July 30, 2014, "affirm[ed] and ratif[ied] any and all actions taken by me or on my behalf during that period, including all personnel and administrative decisions . . . ." Director Walsh, however, did not go on to specifically address any of the particular decisions he made when acting *ultra vires*.

We must, therefore, decide whether this "remedy adequately addressed the prejudice" to Advanced stemming from Walsh's unauthorized conduct. *Federal Election Comm'n v. Legi-Tech*, 75 F.3d 704, 708 (D.C. Cir. 1996). If so, "dismissal is neither necessary nor appropriate." *Id.* "[T]he general rule [is] that the ratification of an act purported to be done for a principal by an agent is treated as effective at the time the act was done. In other words, . . . the ratification 'relates back' in time to the date of the act by the agent." *In re E. Supply Co.*, 267 F.2d 776, 778 (3d Cir. 1959); *see also Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 83 (3d Cir. 2004) (same).

Ratification of previously unauthorized agency action, however, presents a unique situation that has not been specifically dealt with by this Court. Unlike most instances of ratification, here the same party is both the principal and the agent, simply acting at different points in time. That fact alone distinguishes this case from most

19

other ratification cases, but does not mean that we cannot glean some insight into this situation from our prior precedent. Indeed, we find that past precedent suggests there are three general requirements for ratification. First, the ratifier must, at the time of ratification, still have the authority to take the action to be ratified. Second, the ratifier must have full knowledge of the decision to be ratified. Third, the ratifier must make a detached and considered affirmation of the earlier decision. These last two requirements are intended to ensure that the ratifier does not blindly affirm the earlier decision without due consideration. These requirements, of course, must also be adapted to the unique situation we are confronted with here.

We turn to the first requirement, the continuing authority to act. In *Federal Election Commission v. NRA Political Victory Fund*, the Supreme Court had to determine whether belated authorization by the Solicitor General which would have permitted the Federal Election Commission to file a petition for certiorari "relates back to the date of the FEC's unauthorized filing so as to make it timely." 513 U.S. 88, 98 (1994). Ultimately, the Supreme Court held that ratification was not appropriate because the deadline by which the FEC could seek certiorari had passed, preventing ratification. Or to put it another way, "it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, *but also at the time the ratification was*

20

*made*." *Id.* This "timing problem" has since been read to require that the ratifier have the "power" to reconsider the earlier decision at the time of ratification. *See Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213-14 (D.C. Cir. 1998); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015).

The second requirement is that the ratifier must have "knowledge of all the material facts" relating to the decision they are making. *Bauman v. Eschallier*, 184 F. 710, 711 (3d Cir. 1911) ("No one can be held to have ratified the unauthorized act of an agent, unless he has knowledge of all the material facts."); *Toebelman v. Missouri-Kansas Pipe Line Co.*, 130 F.2d 1016, 1022 (3d Cir. 1942) ("Ratification to be effective imports knowledge of all material facts on the part of those ratifying."). This requirement is intended to protect the ratifier from unknowingly ratifying conduct of which he or she was unaware. *Cf. Villanueva v. Brown*, 103 F.3d 1128, 1139 (3d Cir. 1997) ("Her act of signing the Investment Agreement clearly does not ratify an event which had not yet occurred. She cannot ratify an action that she is not aware of.").

Finally, the ratifier must make a "detached and considered judgment," not simply rubberstamp the earlier action. *See Doolin*, 139 F.3d at 213 ("We have no doubt that [the ratifier] made a detached and considered judgment in deciding the merits."). We also note,

however, that evidence of this requirement can either come from acts of "express ratification," *Standard Roller Bearing Co. v. Hess-Bright Mfg. Co.*, 275 F. 916, 921 (3d Cir. 1921), in which the ratifier "conduct[s] an independent evaluation of the merits," *Intercollegiate*, 796 F.3d at 117, or can be "implied from subsequent conduct," *Hess-Bright*, 275 F. at 921, such as when a later act is "necessarily an affirmation of" an earlier act, *Doolin*, 139 F.3d at 213.

All that being said, we are quick to note that as an equitable remedy, ratification has been applied flexibly and has often been adapted to deal with unique and unusual circumstances. We believe that *Doolin* provides a good example both of this adaptability and how ratification can apply in the context of administrative agency action. In this case, the D.C. Circuit had to determine whether the actions of the *properly* appointed Director Retsinas ratified the earlier filing of a Notice of Charges against Doolin Bank by the *improperly* appointed Director Fiechter. The court began its analysis by looking to *NRA Political Victory Fund*. *Id.* at 212. In so doing, it noted that no statute of limitations would prevent Retsinas from "starting the administrative proceedings over again." *Id.* at 213. Thus, the court concluded that the "timing problem posed in *NRA* is not present here." *Id.*

The court then went on to examine the specific evidence of ratification. It noted that while there was no

22

express ratification, Retsinas did not "simply writ[e] a letter or memorandum adopting" the actions of the earlier improperly appointed acting Director. *Id.* Instead, he continued forward "in the normal course of agency adjudication," pursuing the claims Fiechter had initially made. *Id.* Retsinas thus ultimately issued a final written opinion and a cease and desist order against Doolin Bank. This, the court noted, was "necessarily an affirmation of the validity of [Fiechter's earlier conduct], and hence a 'ratification,' even though [Retsinas] did not formally invoke the term." *Id.* The court thus concluded, "[w]e have no doubt Director Retsinas made a detached and considered judgment in deciding the merits against the Bank." *Id.*

Finally, we note one additional consideration that arises in the context of administrative agency ratification: the presumption of regularity. This "doctrine thus allows courts to presume that what appears regular is regular, the burden shifting to the attacker to show the contrary." *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001); *Kamara v. Att'y Gen. of U.S.*, 420 F.3d 202, 212 (3d Cir. 2005) ("Agency action is entitled to a presumption of regularity, and it is the petitioner's burden to show that the [agency] did not review the record when it considered the appeal."). This presumption ensures that we give proper deference and respect to the official actions of an agency. Applying the presumption in our case, the burden is on Advanced to produce evidence that casts

23

doubt on the agency's claim that the Board and Director Walsh properly ratified their earlier actions.

We thus turn to the two acts of ratification. First, regarding the Board's ratification, we begin by noting that Advanced has not pointed to, nor could we find, any statute or regulation that would prevent the Board from restarting the administrative actions in question at the time of ratification. Thus, "the timing problem posed in *NRA* is not present here." *Doolin*, 139 F.3d at 213. We also note that the Board easily satisfies the second and third ratification requirements. The Board claims that it specifically considered the relevant supporting materials before reauthorizing the selection of Walsh as Regional Director. The Board also states that it "confirm[ed], adopt[ed], and ratif[ied] *nunc pro tunc*" all its earlier actions. Advanced does not present any evidence suggesting otherwise. We can therefore presume that the Board had full knowledge of, and appropriately reconsidered, its earlier appointment of Director Walsh. We thus conclude that the Board properly ratified its selection of Director Walsh as a Regional Director.

We next look to Director Walsh's ratification, which raises some additional concerns. First, however, we note that both the first and second requirements for ratification are satisfied here. There is no statutory or administrative limitation preventing Director Walsh from re-running the Union election at the time he ratified it; thus the *NRA* "timing issue" is not implicated here

24

either.[10]   Additionally, the knowledge requirement is easily satisfied: Director Walsh is both the principal and the agent.  Thus, at the time of ratification, he, better than anyone else, had full knowledge of his earlier actions.

The real question concerning Director Walsh's ratification arises from the fact that we are confronted with a barebones, blanket affirmation, without any specific mention of this case or the details of any ratification process.  That being said, the evidence of ratification is stronger than it first appears.  Despite a mere blanket *express* ratification, Director Walsh also *implicitly* affirmed his conduct by filing a Complaint and Notice of Hearing on February 19, 2015.  The allegations in this filing, like in *Doolin*, were "necessarily an

---

[10] Advanced points to § 88 of the Restatement (Second) of Agency, suggesting that by objecting to the authority of Director Walsh, ratification was no longer timely.  This argument attempts to shoehorn a mandatory agency adjudication into the narrow scope of § 88, which deals with "transactions" in which a party can "withdraw" his or her "offer or agreement."  Unlike the situation that arises in a typical business or personal transaction in which a party can prevent ratification by terminating an offer before it is accepted, here Advanced could not simply withdraw its consent to the NLRB's attempted bargaining and enforcement actions.  To put it another way, by objecting to the authority of Director Walsh, Advance did not "terminate" the "transaction" between the Board and Advanced; Advanced could not merely walk away at that point.

25

affirmation of the validity" of his earlier actions in conducting the election in April 2014, since they allege, among other things, that the Union is the proper and "exclusive collective bargaining representative" of Advanced's covered employees.

Lastly, we note that Advanced has not made any claims which undermine the presumption of regularity here either. Advanced only argues that Director Walsh's ratification is a "rubberstamp," and that the blanket ratification lacks evidence of independent consideration. But mere lack of detail in Director Walsh's express ratification is not sufficient to overcome the presumption of regularity.

Advanced also attempts to distinguish *Doolin* by claiming that the court relied on the fact that "redoing the administrative proceedings would bring about the same outcome." *Doolin*, 139 F.3d at 214. The court, according to Advanced, therefore employed a harmless error analysis, essentially concluding that even if ratification were imperfect, the outcome of the adjudication, if redone, would not change. This, they argue, is not the case here. A union election is a "dynamic and fluid situation," in which the "whims of the electorate" are constantly changing. Accordingly, Advanced argues that "there is no certainty in this case, as there was in *Doolin*."

26

While we are uncertain as to the extent to which the *Doolin* court actually relied on this harmless error analysis,[11] we find Advanced's attempt to distinguish *Doolin* unavailing. Advanced is correct that in a close election, the whims of the electorate can easily change the ultimate outcome, but Director Walsh is not ratifying the conduct of every voter in the election; he is ratifying *his own* conduct in facilitating the election. If we recognize this distinction, it becomes clear that what Advanced *really* wants is a second shot at convincing a sufficient number of voters to oppose unionization. Advanced does not argue that Director Walsh's improper appointment in any way affected his *own* conduct and thus prejudiced Advanced. Instead, Advanced asserts that voters might change their minds. To put it bluntly, Advanced hopes that the "whims of the electorate" will favor it if the election is re-run. This argument, therefore, does nothing to distinguish *Doolin*.

We accordingly hold that both the Board and Director Walsh properly ratified their earlier actions.

---

[11] The court noted that unlike the harmless error analysis used in *Legi-Tech*, "[t]he situation here is somewhat different." *Doolin*, 139 F.3d at 213. Indeed, the court noted that "[w]e have *no doubt* that Director Retsinas made a detached and considered judgment." *Id.* (emphasis added).

## V.     Election Day Conduct

We next address whether substantial evidence supported the Board's decision to overrule Advanced's objection and its refusal to grant a new election. Advanced points to several incidents on the morning of the election that it claims destroyed the "laboratory conditions" necessary to ensure a free and fair election. *See General Shoe Corp.*, 77 N.L.R.B. 124, 127 (1948). First, Advanced argues that the Board "inappropriately minimized" the "chaotic scene" at the company's Norristown facility on the morning of the election. In particular, Advanced points to an alleged confrontation between a Union representative and one of Advanced's managers. Second, Advanced highlights the conduct of one of its employees, Christopher Lyons, and argues that the Board "drew unreasonable inferences in finding that" Lyons' actions were not threatening. Each incident will be discussed in detail below.

### A.

As this Court has consistently held, we will accept the Board's factual findings and the reasonable inferences derived from those findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f); *see Stardyne, Inc. v. NLRB*, 41 F.3d 141, 151 (3d Cir. 1994). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Tri-State Truck Serv., Inc. v. NLRB*, 616 F.2d 65, 69 (3d Cir. 1980) (internal quotation marks and citations omitted). The substantiality of the evidence must also "take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). We will also "defer to the Board's credibility determinations," and will reverse them "only if they are inherently incredible or patently unreasonable." *Grane Health Care v. NLRB*, 712 F.3d 145, 149 (3d Cir. 2013) (internal quotation marks omitted).

Because Advanced claims that allegedly disruptive election-day conduct necessitates a new election, the key question on appeal is whether the challenged conduct destroyed the "laboratory conditions" which this Court has held are "conducive to the sort of free and untrammeled choice of representatives contemplated by the [NLRA]." *Zeiglers*, 639 F.2d at 1004-05. In *Zeiglers*, however, we were also quick to note that "the goal of 'laboratory conditions' cannot always be satisfied." *Id.* at 1006. Accordingly, we held that "[n]ot every election that fails to achieve perfection should be set aside." *Id.* Instead, we noted that we would uphold "less-than-perfect" elections as long as "no coercive conduct has poisoned the fair and free choice which employees are entitled to make." *Id.*

29

**B.**

Advanced first alleges that on the morning of April 17, 2014, Union Business Agent Chris O'Donnell engaged in conduct which interfered with employees' exercise of free choice in the election.[12] Advanced explains that O'Donnell parked an eighteen-wheeler at the bottom of Advanced's driveway, creating a safety hazard since only one vehicle at a time could pass by. This made it difficult to see trucks entering or leaving the Advanced facility. Advanced also alleges that when Manager Ed Smith approached O'Donnell and asked him to move the truck, he said he would only move his truck if Advanced moved the five garbage trucks it had positioned around the facility with "Vote No" signs on them. Advanced then points out that the Union organizer threatened to "create havoc" by bringing in additional union demonstrators and starting a "brawl." Advanced further asserts that Union supporters "jumped out" and waved "Vote Yes" signs at workers as they drove by. This prompted Advanced's managers to call the police, who arrived at the facility and told both parties to move

---

[12] When evaluating conduct-based objections like this, the Board employs an objective standard to determine whether the conduct had a reasonable tendency to interfere with the employees' exercise of their free choice. This analysis looks to several factors including the number, severity, and proximity of the incident(s) to the election. *Trump Plaza Hotel & Casino*, 352 NLRB 628, 629, 632 (2008).

their vehicles. Even though this resolved the immediate dispute, the police chose to remain on the scene.

The hearing officer, however, characterized this incident a bit differently. First, he chose to credit the testimony of O'Donnell—who stated that Smith's allegations were unfounded—because it "was more logical and plausible. Second, the hearing officer pointed out that, according to the police report, Advanced's garbage trucks also blocked part of the driveway, thus contributing to the safety hazard. Third, the hearing officer noted that police presence alone is not objectionable at a Union election under prevailing precedent. Nor was there any indication that the police even talked to anyone at the scene besides Advanced managers and the Union representatives. Fourth, even assuming the facts were as Smith testified, the hearing officer noted that there was no indication the alleged threat was disseminated to any eligible voters—or to anyone else for that matter. The hearing officer therefore concluded that O'Donnell's conduct did not "interfere[] with employee's exercise of free choice" in voting that morning.

We hold that substantial evidence in the record supports this conclusion. Due to the minimal dissemination of the alleged, and discredited, threat, as well as the fact that the police report found both parties contributed to the "chaos" that morning, there is nothing to suggest that the Board inappropriately ignored or

minimized evidence of dissemination and failed to "properly consider the totality of the circumstances" surrounding the above incident, as Advanced argues.

The heart of Advanced's complaint, however, relates to the conduct of Christopher Lyons. Lyons was a driver at Advanced and a Union supporter. He is also described as being approximately six feet tall, two hundred pounds, and "pretty built and stocky." Regarding his conduct on the morning of the election, Advanced first notes that Smith testified to seeing Lyons "c[o]me flying" through the parking lot that morning, "tires squealing and everything." Smith then testified that Lyons and two other employees hung out for several hours that morning in the small room where employees clock in. This was unusual behavior, since "nobody really congregates there." All three employees were also Union supporters and Advanced alleges that they intimidated several of the employees who went to clock in, noting testimony which stated that at least fifteen eligible voters clocked in during that period. When another employee, Ben Shackleford, came to clock in, a heated discussion arose after Lyons found out that Shackleford intended to vote (or already had voted, it is unclear) against unionization. This argument lasted no more than ten minutes and ended with Lyons dropping to his knees and pounding the wall in frustration. Another Advanced employee later testified that the argument was

loud enough to be heard outside and that other Advanced employees could possibly have heard it.

Advanced argues that news of this incident spread quickly throughout the facility and created an atmosphere in which employees felt intimidated, undermining the possibility of a fair election. Advanced also pointed to the fact that the vote was incredibly close: sixty to fifty-eight, with one contested vote. Thus, *any* employee who changed his or her vote from a 'yes' to a 'no' would have changed the outcome of the election. Finally, Advanced challenges the hearing officer's characterization of this incident, claiming that he went to great lengths to "discount the manager's testimony" and downplay the Lyons/Shackleford argument as simply a "personal disagreement between two friends."[13]

Looking first at the speeding incident in the parking lot, the hearing officer noted that the details of

---

[13] The hearing officer also concluded that Lyons was not an official agent of the Union. This is not challenged on appeal. Accordingly, the standard for third-party behavior is whether it was "so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." *Robert Orr-Sysco Food Servs., LLC*, 338 NLRB 614, 615 (2002); *see also NLRB v. L & J Equip. Co.*, 745 F.2d 224, 239 (3d Cir. 1984) ("We recognize that acts attributable to third parties are not subject to the same level of scrutiny as acts attributable to the union or employer.").

Lyons' driving into the parking lot were a bit murky. No one questioned Lyons about his conduct that morning, he was not disciplined for it, and Smith (whose testimony alone referenced it) was not found to be credible by the hearing officer. Additionally, Smith later admitted that he was not actually sure how fast Lyons was going (after earlier stating that it was about 50 m.p.h.), and instead said that he was going at least fast enough to make the tires squeal. The hearing officer thus concluded that the speeding incident was "unlikely," and even if it did occur, it did not create an atmosphere of fear and reprisal at the facility, in part because "there is no evidence that any employee witnessed or learned of this conduct during the critical period." We thus hold that these findings were supported by substantial evidence in the record, and that even if we credit the testimony of Smith, the conduct as he described it is simply insufficient to create an atmosphere of fear and reprisal that would influence an election.

Regarding the Lyons and Shackelford interaction, the hearing officer and the Board credited the testimony of the Advanced managers who witnessed the incident, finding that (1) Lyons and Shackleford got into a loud and heated argument over the Union election, (2) Lyons pounded the wall at least once in frustration, but (3) this and any other conversations were limited to the area around the room where employees clock in, which was as far from the polling place as possible in the facility.

34

Even taking these facts in the light most favorable to Advanced, the hearing officer concluded that Lyons' conduct did not create a "general atmosphere of fear and reprisal" necessary for finding that the election was no longer free.[14] The hearing officer also concluded that the interaction, while loud, did not constitute a threat of physical violence toward Shackleford. Further, the hearing officer noted that the wall was not damaged, Lyons had never gotten into a violent confrontation with another employee, Lyons was named employee of the month in August 2013, and the managers (who were only a few feet away) chose not to intervene. Accordingly, the incident was deemed insufficient to warrant setting aside the election.

In reviewing the record on this issue, we also note that the arguments Advanced puts forward turn largely on questions of credibility and would require us to reevaluate the weight that should be afforded to different pieces of evidence. We are cognizant of our precedent explaining that "we defer to the Board's credibility determinations," and will reverse them "only if they are inherently incredible or patently unreasonable." *Grane Health Care*, 712 F.3d at 149 (internal quotation marks omitted). Quite simply, the credibility determinations made by the hearing officer and adopted by the Board are

---

[14] The hearing officer also properly acknowledged that this conduct required additional scrutiny as the election was extremely close.

not inherently incredible. Viewing the contested conduct in this light, we conclude that substantial evidence supported the Board's decision.

We accordingly hold that the Board's determinations regarding the challenged election-day conduct are supported by substantial evidence.

## VI. Conclusion

Our review of this case convinces us that the actions of the Board and Director Walsh were, ultimately, both procedurally and substantively valid. We will therefore deny Advanced's petition for review and grant the NLRB's cross-application for enforcement of its order.