**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2220

CORAL HARBOR REHABILITATION AND
NURSING CENTER,
Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent
_____

No. 18-2619

NATIONAL LABOR RELATIONS BOARD,
Petitioner

v.

CORAL HARBOR REHABILITATION AND
NURSING CENTER,
Respondent
_____

On Application for Enforcement and Cross-Petition for
Review of an Order of the National Labor Relations Board
(NLRB-1 No. 22-CA-167738)
_____

Submitted March 11, 2019
_____

Before: McKEE, PORTER, and ROTH, *Circuit Judges*.

(Filed: December 26, 2019)

Louis J. Capozzi, Jr.
Brandon S. Williams
Capozzi Adler
2933 North Front Street
Harrisburg, PA 17110

*Counsels for Petitioner in No. 18-2220*

Ruth E. Burdick
David Habenstreit
Saulo Santiago.
David A. Seid,
National Labor Relations Board
1015 Half Street, S.E.
Washington, DC 20570

*Counsels for Petitioner in No. 18-2619*

_____

OPINION OF THE COURT
_____


McKEE, *Circuit Judge*.

Coral Harbor Rehabilitation and Nursing Center (the "Center") asks us to review the National Labor Relations Board's determination that the Center violated Sections 8(a)(5) and (1) of the National Labor Relations Act by (1) refusing to bargain with 1199 Service Employees International Union United Healthcare Workers East (the "Union") as the representative of the Center's licensed practical nurses ("LPNs") and (2) unilaterally changing their wages and benefits without notice to the Union or providing the Union an opportunity to bargain.[1] Because the Board's decision is consistent with precedent and supported by substantial evidence, we will deny the Center's petition for review and grant the Board's cross-application for enforcement.

---

[1] 29 U.S.C. § 158(a)(5) & (1).

## I.    BACKGROUND

The Center purchased a nursing home in which the Union represented two separate units of employees – a unit of LPNs and a unit of service employees that included certified nursing assistants ("CNAs").[2]  After the purchase, the Center hired a majority of the LPNs who had worked for the former employer, increased their wages, and changed their paid leave and health benefits, without making any effort to bargain the changes with the Union.  Approximately 25 LPNs and 36 CNAs were ultimately employed by the Center.

After the Center changed the terms of the LPNs' employment, the Union filed charges of unfair labor practices, alleging that the Center had violated Sections 8(a)(5) and (1) of the NLRA by refusing to bargain with the Union as the representative of the LPNs, and by later making unilateral changes to their wages and benefits without notice to the Union or providing the Union an opportunity to bargain.

After an initial investigation, the Board's General Counsel filed a complaint of unfair labor practices against the Center.  The Center responded that it was a *Burns* successor and therefore not under any obligation to recognize or bargain with the Union over the changes in the terms of the LPNs' employment because the LPNs had been converted into supervisors and were therefore exempt from the protections of the NLRA.

Thereafter, an administrative law judge conducted an evidentiary hearing at which four of the Center's LPNs, its Director of Nursing ("DON"), and its Administer testified about the activities and responsibilities of the LPNs. According to that testimony, the LPNs did not attend morning staff meetings with managers but did receive completed master schedules and could add or subtract CNAs on the schedule with permission from the DON.  The LPNs were told that they

---

[2] LPNs at the Center distribute medication, provide treatments, and ensure that the needs of residents are met. CNAs provide basic care to residents and assist with daily living functions, such as feeding, grooming, dressing, walking, hygiene, and bathing.

3

would play an active role in supervising CNAs, would have the authority to exercise their independent judgment, were expected to discipline employees, and complete employee evaluations.

A section of the employee handbook entitled "Role of Licensed Professional Nurses (LPNs) and Registered Nurses (RNs)" stated: "RN and LPN Supervisors . . . have the responsibility to issue discipline (oral and written warnings) to nursing assistants when they believe warranted. Discipline can be for matters relating to resident care or for violations of the employee rules of conduct under Coral Harbor's Progressive Disciplinary System."[3] A Notice of Disciplinary Action ("disciplinary notice") is a form containing a narrative about an employee's infraction and the type of discipline issued, i.e., verbal warning or write-up.

Testimony offered by the LPNs at the hearing regarding specific instances of imposing discipline can be summarized as follows: LPN 1 testified that she has not personally disciplined anyone, but that she has signed and delivered disciplinary notices for two employees that were completed by the DON. The DON filled out the disciplinary notices and gave them to her to issue. In fact, according to LPN 1, she was not present when either employee committed their respective infractions.

LPN 2 testified that she twice imposed discipline against the same CNA—a verbal warning and a written discipline for re-education. However, like LPN 1, LPN 2 did not witness the infraction and did not have access to the personnel file of the CNA to know what "level" of discipline to administer. She was, however, instructed by the Administrator and DON on how to proceed in terms of discipline. The severity and ultimate approval of the discipline was left to the discretion of the DON.

LPN 3 testified that she would first have to get the disciplinary notice from the DON and consult with the DON

---

[3] JA-1224.

4

or a supervisor[4] before disciplining anyone. When she wrote the narrative on the disciplinary notice for an employee, the verbal warning and approval of the discipline was determined by the DON. LPN 3 further testified that on two separate occasions she was asked to deliver a disciplinary notice to a CNA, but the notice itself had been filled out by a supervisor. On each of those occasions, her only role was the physical delivery of the notice.

Lastly, LPN 4 testified that she issued three disciplinary notices, without instruction or consultation and made formal recommendations, but the subsequent discipline was handled by the unit manager. However, LPN 4 also testified that for three other disciplinary notices she was simply asked for her signature on a notice that was already completed, or she was instructed to write up the notice for an infraction she had not observed.

The DON testified that if an LPN completed a disciplinary notice for a CNA, she (the DON) would investigate and review the personnel file, which the LPN did not have access to, and then determine the appropriate severity of the discipline. The DON confirmed that she or the staffing coordinator determined CNA schedules. An LPN could not perform independent scheduling or direct employees in their assignment—only the DON could. The LPNs testified that they were not involved in training of the CNAs; again, that was the responsibility of the DON.

Based on the testimony, the ALJ found that the Center was a *Burns* successor and that it had hired a majority of its predecessor's employees. The ALJ thus concluded that the Center had an obligation to bargain with the union of its predecessor. The ALJ also found that the LPNs were not supervisors as defined by Section 2(11) of the NLRA but were instead, statutory employees protected by the NLRA and represented by the Union. Accordingly, the ALJ held that the Center violated Sections 8(a)(5) and (1) of the NLRA by refusing to recognize and bargain collectively with the Union,

---

[4] LPN 3's use of the term "supervisor" during her testimony referred to either a unit manager or the assistant DON ("ADON"), but never an LPN.

and by making unilateral changes to the wages and benefits of the LPNs without notice to the Union or giving it an opportunity to bargain over the changes.

The Center filed exceptions with the Board but limited its challenge to the ALJ's findings regarding the LPNs' role in discipline and adjusting grievances. The Board affirmed the ALJ's rulings and findings. The Board specifically concluded that the Center failed to establish that the LPNs (1) have supervisory authority to discipline or effectively recommended discipline or (2) possess the supervisory authority to adjust grievances.

Thereafter, the Center petitioned us to review the Board's decision, and the Board cross-petitioned for enforcement of its order.[5]

## II. STANDARD OF REVIEW

Our "review of orders of the Board is highly deferential."[6] "We accept the Board's factual findings if they are supported by substantial evidence . . . [and] exercise plenary review over questions of law and the Board's application of legal precepts."[7] Substantial evidence "means relevant evidence that a reasonable mind might accept as adequate to support a conclusion."[8]

## III. DISCUSSION
### A. *NLRB v. Burns*

In *NLRB v. Burns Int'l Sec. Servs., Inc.*,[9] the Supreme

---

[5] The Board possessed jurisdiction over the unfair-labor-practice proceeding under Section 10(a) of the NLRA. 29 U.S.C. § 160(a). We have jurisdiction pursuant to Section 10(e) and (f) of the NLRA. 29 U.S.C. § 160(e), (f).

[6] *Trimm Assocs., Inc. v. NLRB*, 351 F.3d 99, 102 (3d Cir. 2003).

[7] *Spectacor Mgmt. Grp. v. NLRB*, 320 F.3d 385, 390 (3d Cir. 2003); *see Adv. Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 606 (3d Cir. 2016).

[8] *NLRB v. ImageFIRST Unif. Rental Serv., Inc.*, 910 F.3d 725, 732 (3d Cir. 2018).

[9] 406 U.S. 272 (1972).

Court held that a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor. It is therefore undisputed that as a successor-employer, the Center had the right to set the initial terms of employment for LPNs when it took over operations for the nursing home. Accordingly, "[a] new employer has a duty under §8(a)(5) [of the NLRA] to bargain with the incumbent union that represented the predecessor's employees when there is a 'substantial continuity' between the predecessor and successor enterprises."[10] As the Court explained in *Burns*:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.[11]

Thus, under *Burns*, "the new employer, succeeding to the business of another, had an obligation to bargain with the union representing the predecessor's employees."[12]

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."[13]

Section 8(a)(1) states: "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights.[14] Section 8(a)(5) states: "[i]t shall be an unfair labor practice for

---

[10] *Chester ex rel. NLRB v. Grane Healthcare Co.*, 666 F.3d 87, 100 (3d Cir. 2011) (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987)).

[11] *Burns*, 406 U.S. at 294–95.

[12] *Fall River Dyeing*, 482 U.S. at 29 (citing *Burns*, 406 U.S. at 278–79).

[13] 29 U.S.C. § 157.

[14] 29 U.S.C. § 158(a)(1).

an employer . . . to refuse to bargain collectively with the representatives of [its] employees."[15]

However, not all employees are included under the protective umbrella of the NLRA and collective bargaining. Employers are not required to afford collective bargaining rights to supervisory employees.[16] The Center concedes that it refused to bargain with the Union on behalf of the LPNs and that it unilaterally changed the LPNs' wages and benefits without notice to the Union and without providing the Union an opportunity to bargain. Therefore, resolution of this dispute turns on whether the LPNs were statutory supervisors under Section 2(11) of the NLRA.

## B. *NLRB v. Kentucky River*

"To be entitled to the [NLRA's] protections and includable in a bargaining unit, one must be an 'employee' as defined by the [NLRA]."[17] The NLRA states that the term "employee" includes:

> any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but **shall not include** any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or **any individual employed as a supervisor**, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an

---

[15] 29 U.S.C. § 158(a)(5).

[16] *See* 29 U.S.C. § 152(3).

[17] *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011) (citing 29 U.S.C. § 152(3); *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001)).

employer as herein defined.[18]

Thus, the NLRA excludes supervisors from the definition of "employee." "Supervisor" is defined as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.[19]

Supervisors are not protected under the NLRA provisions that protect employees, and supervisors are not included in a bargaining unit.[20]

"Whether someone is a supervisor is a question of fact, and thus will be upheld if . . . supported by substantial evidence."[21] In *Kentucky River*, the Supreme Court decided "which party in an unfair-labor-practice proceeding bears the burden of proving or disproving an employee's supervisory status; and whether judgment is not 'independent judgment' to the extent that it is informed by professional or technical training or experience."[22] The Court acknowledged that the NLRA does not "expressly allocate the burden of proving or disproving a challenged employee's supervisory status."[23] The Board "has filled the statutory gap with the consistent rule that the burden is borne by the party claiming that the employee is a supervisor."[24]

As the party claiming supervisory status, the Center

---

[18] 29 U.S.C. § 152(3) (emphasis added).

[19] 29 U.S.C. § 152(11).

[20] *See* 29 U.S.C. § 152(3).

[21] *Mars Home*, 666 F.3d at 853.

[22] 532 U.S. at 708.

[23] *Id.* at 710.

[24] *Id.* at 710–11.

bears the burden of establishing it here.[25]  Whether an individual is a statutory supervisor is a question of fact particularly suited to the Board's expertise and therefore subject to limited judicial review.[26]  We must uphold the Board's supervisory-status conclusion as long as it is supported by substantial evidence, "even if we would have made a contrary determination had the matter been before us *de novo*."[27]

In *Kentucky River*, the Court established the following three-part test for determining whether an individual is a supervisor:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions [in Section 2(11)], (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer.[28]

The Center alleges that the LPNs were supervisors under the NLRA because they had authority to discipline or effectively recommend discipline of CNAs.  We disagree.

It is clear under *Kentucky River* that our inquiry here must focus on whether the LPNs have "use of independent judgment" to impose discipline.[29]  A person exercises independent judgment if she "act[s], or effectively recommend[s] action, free of the control of others and form[s] an opinion or evaluation by discerning and comparing data."[30]  Judgment is not independent if it is "dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the

---

[25] *Mars Home*, 666 F.3d at 854.

[26] *Id.* at 853.

[27] *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

[28] 532 U.S. at 713 (internal quotation marks and citations omitted).

[29] *Id.*

[30] *In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686, 693 (2006).

provisions of a collective bargaining agreement."[31]  Moreover, in order for judgment to be independent, it "must involve a degree of discretion that rises above the 'routine or clerical.'"[32]  This standard seeks to distinguish "between straw bosses, leadmen, set-up men, and other minor supervisory employees," who are included within the NLRA's protections, "and the supervisor vested with such genuine management prerogatives as" those established under Section 2(11).[33]

This record supports the Board's conclusion that the Center's LPNs lacked independent judgment as required under Section 2(11).  The Board agreed with the ALJ's findings that "[a]ll discipline must be cleared with the DON or manager and the DON or manager must approve all recommendations of discipline of employees."[34]  While the four LPNs who testified stated that they issued disciplinary notices to CNAs, they all also testified that they did not fill out the level or type of discipline on the disciplinary notices.  Instead, that section of the notice was left open to be "signed off" and imposed by the DON.

Moreover, the LPNs did not have access to employee personnel files and therefore could not know what level of discipline was appropriate in any given case.  Rather, it was the DON who filled out disciplinary notices herself or received notices from an LPN, investigated the matter, talked to the CNA, and determined the appropriate level of discipline.  Accordingly, it can hardly be said that the LPNs were responsible for administering discipline to the extent required for supervisory status under the NLRA.

Furthermore, it is unclear whether there are established policies that control whether a verbal warning will be issued for a given infraction as opposed to a written one or whether there is some form of incremental discipline.  "Under its written disciplinary policy, [the Center] retains discretion to

---

[31] *Id.*

[32] *Id.*

[33] *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 280–81 (1974) (citing S. Rep. No. 105, 80th Cong., 1st Sess., 4 (1947).

[34] JA-22.

impose whatever level of discipline it determines is appropriate, and the disciplinary notices in the record do not follow any defined progression."[35] However, it is clear that LPNs cannot exercise independent discretion to decide the level of discipline that will be imposed.

The Board agreed with the ALJ's conclusion that: (1) LPNs do not have the authority to assign or the responsibility to direct CNAs with use of independent judgment; (2) LPNs do not have authority to discipline CNAs and others; (3) the evaluations of CNAs are not determinative of LPN supervisory status; and (4) LPNs do not have accountability nor authority to responsibly direct.[36]

### C. *NLRB v. Vista Nursing*

The Center further argues that under our decision in *NLRB v. New Vista Nursing and Rehabilitation*, the NLRA does not preclude an LPN from having supervisory authority merely because her recommendation is subject to a superior's investigation.[37] In *New Vista*, we identified two considerations which do not negate supervisory status: "(1) whether a nurse's supervisor undertakes an independent investigation; and (2) whether the employees exercise their supervisory authority only a few times (or even just one time)."[38] We also recognized that three factors – considered in the aggregate – may establish that an individual is a statutory supervisor: "(1) the [individual] has the discretion to take different actions, including verbally counseling the misbehaving employee or taking more formal action; (2) the [individual's] actions 'initiate' the disciplinary process; and (3) the [individual's] action functions like discipline because it increases severity of the consequences of

---

[35] *Coral Harbor Rehab. & Nursing Ctr. & 1199 SEIU United Healthcare Workers E.*, 366 NLRB No. 75, *1 n.6 (May 2, 2008).

[36] Under the third prong of our *Kentucky River* inquiry we determine whether the authority of the alleged supervisors is held in the interest of the employer; however, since we conclude that the Board correctly ruled that the Center's LPNs are not statutory supervisors under prongs one or two, we need not reach prong three. *See* 532 U.S. at 713.

[37] 870 F.3d 113, 132–33 (3d Cir. 2017).

[38] *Id.* (internal quotation marks and citations omitted).

12

a future rule violation."[39]

Here, after the Board decided that the ALJ's conclusion was consistent with *Kentucky River*, it specifically cited to our decision in *New Vista*, explaining that "the same result would obtain under the standards employed by the United States Court of Appeals for the Third Circuit [in *New Vista Nursing*]."[40] We agree.

Notwithstanding the Center's reliance on *New Vista*, it is clear that the LPNs here lacked discretion to impose discipline. The Board found, "[i]n every instance where an LPN-witness was questioned about a specific disciplinary notice, the witness testified, without contradiction, that a manager had instructed the LPN to fill out and sign the disciplinary notice, had actually filled out the disciplinary notice and simply instructed the LPN to sign it, or had brought a CNA's infraction to the LPN's attention and suggested that a disciplinary notice was warranted."[41] It is clear that the Center's LPNs do not have "discretion to take different actions,"[42] unless instructed by a manager.

The Center has failed to carry its burden and did not establish that the LPNs "initiate a progressive disciplinary process"[43] or that such a process even exists. Nowhere in the Center's brief does it offer an explanation of how any of its disciplinary actions follow a progressive disciplinary policy "and the disciplinary notices in the record do not follow any defined progression."[44] And because the LPNs lacked access to CNA personnel files, they could not determine appropriate levels of discipline. The LPNs' inability to determine which level of discipline was appropriate demonstrates that there was a clear lack of "supervisor" training for LPNs and their actions did not "initiate a progressive disciplinary process."[45]

---

[39] *Id.* at 132.

[40] 366 NLRB at *1 n.6.

[41] *Id.*

[42] *New Vista*, 870 F.3d at 132.

[43] *Id.* at 136.

[44] *Coral Harbor*, 366 NLRB at *1 n.6.

[45] *New Vista*, 870 F.3d at 132.

Lastly, the Center has not established that an LPN's involvement with disciplinary notices "increases severity of the consequences of a future rule violation."[46]  As we have explained, unit managers, the ADON, or the DON impose the level of discipline they deem to be appropriate at any given time.  There is also evidence of individual CNAs receiving the same level of discipline for multiple infractions.  Nowhere does the record establish that a subsequent infraction increased the severity of discipline after an LPN was involved in issuing a prior disciplinary notice.

**IV.**

For the reasons set forth above, we conclude that substantial evidence supports the Board's determination that the LPNs were not statutory supervisors and they were therefore not excluded from the NLRA's protections. Accordingly, the Center had an obligation to inform the Union of the changes it made in the LPNs' duties and to refrain from making those changes in the absence of bargaining with the Union.  We will therefore deny the Center's petition for review and grant the Board's cross-application for enforcement.

---

[46] *Id.* at 136.